STATE of Iowa, Appellee,

v.

James Wendell HALL, Appellant.

No. 57467.

Supreme Court of Iowa.

Nov. 12, 1975.

Rehearing Denied Dec. 11, 1975.

704

William M. Tucker and Bruce L. Walker, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Gary A. Ahrens, Nancy J. Shimanek, and John Grant Mullen, Asst. Attys. Gen., and Carl Goetz, Johnson County Atty., for appellee.

LeGRAND, Justice.

Defendant was charged under § 690.1, The Code, 1973, with the unlawful killing of Sarah Ann Ottens. A jury found him guilty of second degree murder. Subsequently defendant was sentenced under § 690.3, The Code, 1973, to serve a term of 50 years in the penitentiary, a judgment from which he now appeals. We affirm on condition and remand the case for further inquiry according to the instructions in Division IX hereof.

Although we save a detailed discussion of the facts for presentation later as we consider the issues raised, we give now a brief outline of the circumstances under which this crime was committed.

Defendant and Sarah Ann Ottens, each 19 years old, were students at the University of Iowa. During the University's spring vacation in 1973, the campus population was depleted, but defendant and Miss Ottens were among those who stayed on during the scholastic break. There is no evidence they knew each other.

On March 13, 1973, Miss Ottens' dead body was found in Room 429 of Rienow Hall, a university dormitory. An autopsy disclosed she had died of asphyxiation by strangulation. Apparently the murderer had held a broom handle against her throat, a maneuver which medical testimony established could cause death within one minute. Her body was nude from the waist down, and she had been brutally beaten and assaulted. However, there is no evidence of sexual attack.

Defendant lived in Slater Hall, a dormitory across the street from Rienow Hall. There is evidence from which the jury could have found he was in the victim's room in Rienow Hall at or near the time the murder occurred. We refer to this testimony in greater detail later.

Defendant has set out more than 40 claimed errors, raising the following issues, which we will consider in the order listed:

I. Irregularities and errors in the grand jury proceedings;

II. Refusal to order production of evidence;

III. Error in overruling defendant's motion for directed verdict;

IV. Error in ruling on defendant's motion to suppress and motion in limine;

V. Errors in evidentiary rulings;

VI. Errors in the instructions, both as to those given and as to those refused;

VII. Prosecutorial misconduct; and

VIII. Jury misconduct.

### I. Grand Jury Proceedings

One of the most serious complaints—and certainly the one most vigorously argued—centers around the grand jury proceedings. Defendant raised these matters in several ways. First, he filed a motion to set aside the indictment before entering a plea, as required by § 776.1, The Code. This was overruled.

After a motion for bill of particulars had been partially sustained and additional particulars had been furnished, defendant filed another motion to see aside the indictment as he is then permitted to do by § 773.7, The Code. This motion, too, was overruled.

He later made alleged grand jury irregularities a ground for relief in his motion for new trial filed after his conviction.

Defendant's argument is more than a complaint about proceedings in this case. It constitutes an impassioned assault on the grand jury system generally. He says it is archaic, oppressive and simply a tool to be manipulated as the prosecutor sees fit. Such criticisms of the grand jury are not new, although recently they have been increasing in both frequency and severity. See *The Grand Jury—Prosecutorial Abuse of the Indictment Process*, 65 J. of Crim. Law and Criminology, 157–169 (1974); *Johnson v. Superior Court*, 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792 (1975), concurring opinion.

■ Be that as it may, it appears the alternative facing defendant, if we could by some hidden judicial power abolish the grand jury, would be even worse. The only other way in which one charged with a crime may be brought to trial is on county attorney's information. See § 769.1, The Code. If, as defendant argues, the county attorney may impose his will upon the grand jury, the filing of an information to start prosecution is even more subject to that criticism, being completely within his discretion, except for the provisions of § 769.2, The Code. It is perhaps unnecessary to point out this argument must be directed to the legislature, not to us.

The manner in which an indictment may be set aside is regulated by statute. § 776.1 provides as follows:

"The motion to set aside the indictment can be made, before a plea is entered by the defendant, on one or more of the following grounds, and must be sustained:

"1. When it is not endorsed 'a true bill' and the endorsement signed by the foreman of the grand jury as prescribed by this code.

"2. When the names of all witnesses examined before the grand jury are not endorsed thereon.

"3. When the minutes of the evidence of the witnesses examined before the grand jury are not returned therewith.

"4. When it has not been presented and marked 'filed' as prescribed by this code.

"5. When any person other than the grand jurors was present before the grand jury when the question was taken upon the finding of the indictment.

"6. When any person other than the grand jurors was present before the grand jury during the investigation of the charge, except as required or permitted by law.

"7. That the grand jury were not selected, drawn, summoned, impaneled, or sworn as prescribed by law, except as hereinafter provided."

■ Except on constitutional grounds (which we discuss later), the statutory grounds for setting aside an indictment are exclusive and only those which are listed may be the basis for such action. *State v. Olson*, 249 Iowa 536, 554, 86 N.W.2d 214, 221 (1958); *State v. Lamb*, 239 Iowa 176, 179–180, 30 N.W.2d 734, 736 (1948); *State v. Boucher*, 237 Iowa 772, 777–778, 23 N.W.2d 851, 854 (1946).

■ Defendant's motion, made before entering his plea, was limited to two grounds as follows:

"1. That the minutes of testimony attached to the indictment do not contain particulars constituting the offense charged in the indictment;

"2. That the minutes of testimony attached to the indictment do not show that the defendant committed the offense charged in the indictment."

Since neither of these is among the statutory grounds for setting aside an indictment, this motion was properly overruled.

Our statutory law also provides a defendant may ask for a bill of particulars if the manner in which he is charged is insufficient to "enable him to prepare his defense, or to give him such information as he is entitled to under the constitution of this state." § 773.6, The Code.

■ If such a bill of particulars is ordered by the court, defendant may thereafter move again to set aside the indictment under the provisions of § 773.7, which we here set out in full:

"If it appears from the bill of particulars furnished under section 773.6 that the particulars stated do not constitute the offense charged in the indictment, or that the defendant did not commit that offense, or that a prosecution for that offense is barred by the statute of limitations, the court may and on motion of defendant shall set aside the indictment unless the county attorney shall furnish another bill of particulars which so states the particulars as to show that the particulars constitute the offense charged in the indictment and that the offense was committed by the defendant and that it is not barred by the statute of limitations."

A bill of particulars was furnished in this case, and defendant availed himself of § 773.7 in a second effort to have the indictment set aside. This time his motion included 10 numbered paragraphs, argumentative in form, challenging the sufficiency of the evidence upon which the indictment was based, alleging that much of the evidence introduced before the grand jury would be inadmissible at trial, and urging that the indictment be set aside.

■ Only this one paragraph of the motion comes within the purview of § 773.7:

"The admissible testimony and even all of the testimony as shown by the indictment and bill of particulars failed to show that the defendant committed the offense charged."

The trial court ruled, rightly, that the indictment should not be dismissed, and defendant's motion was accordingly overruled.

It is interesting to note that defendant at this point had not yet raised the constitutional issues of equal protection and due process which he now so strenuously urges upon us. They were first introduced into this case in defendant's motion for new trial filed after conviction and before sentencing, where he set out these new complaints concerning the grand jury proceedings:

(1) Failure of the State to comply with the provisions of § 771.13, The Code, relating to the filing of exhibits used in connection with the grand jury proceedings;

(2) Failure of the State to attach to the indictment the names and minutes of testimony of all witnesses who testified before the grand jury;

(3) Introduction of evidence before the grand jury on matters wholly unrelated to the charge which they were then investigating and which were so prejudicial as to violate defendant's rights of equal protection and due process under the Federal Constitution and the Constitution of the State of Iowa;

(4) An allegation that the alleged minutes attached to the indictment were not the minutes as required by law, which clearly called for production of a full court reporter's transcript of testimony; and

(5) That the grand jury indictment was based upon inadmissible evidence which was prejudicial to defendant and violated defendant's constitutional rights of equal protection and due process.

■■ The argument that specific statutes were violated by the manner in which the indictment was returned and the exhibits and minutes filed will not be considered. In the first place, we have held such sections to be directory only and not mandatory. *State v. Kroll,* 244 Iowa 173, 179, 55 N.W.2d 251, 255 (1952) and citations; *State v. Bading,* 236 Iowa 468, 475, 17 N.W.2d 804, 808 (1945). We have also held that the

requirement that minutes be attached to the indictment means only minutes as to the material evidence and need not include the minutes of *all* witnesses who appeared, some of whom will not be called to testify. *State v. Schlater,* 170 N.W.2d 601, 605 (Iowa 1969); *State v. Stump,* 254 Iowa 1181, 1198, 119 N.W.2d 210, 220 (1963); *State v. Stafford,* 237 Iowa 780, 782–783, 23 N.W.2d 832, 834 (1946).

These are all matters which cannot be raised now, either because they are not among the statutory grounds for setting aside an indictment or, if they are, because defendant did not assert them in either motion to set aside the indictment. *State v. Schlater, supra,* 170 N.W.2d at 606–607; *State v. Boucher, supra,* 237 Iowa at 777, 23 N.W.2d at 854; *State v. Stafford, supra,* 237 Iowa at 782, 23 N.W.2d at 834; *State v. Bading, supra,* 236 Iowa at 475, 17 N.W.2d at 807.

■ However, there remains the larger issue raised by defendant's claim he was denied his constitutional right to equal protection and due process. While there may be some doubt defendant raised these issues at the earliest opportunity, as we have said he must do in *State v. Maestas,* 224 N.W.2d 248, 250 (Iowa 1974); *State v. Boer,* 224 N.W.2d 217, 218 (Iowa 1974); and *State v. Ritchison,* 223 N.W.2d 207, 214 (Iowa 1974), we nevertheless consider this matter on its merits because of the grave crime involved and the serious charges made.

In doing so, we refer back to the early part of this division in which we discussed defendant's charges the grand jury system is merely a tool controlled by the whim of the prosecutor. It is claimed that is what happened here. Defendant bitterly assails Assistant Attorney General Gary Woodward, who handled the grand jury proceedings, for injecting incompetent, irrelevant and prejudicial testimony which bore no relationship to the matter then before that body. It is also alleged he made numerous gratuitous statements attacking defendant's character and setting out irrelevant

past conduct which could only be prejudicial.

■ Many of these accusations are borne out by the record. We agree with defendant's counsel that the prosecutor exceeded the bounds of propriety. His duty in grand jury proceedings is to fairly and dispassionately present not only that evidence which tends to prove guilt but also that which is exculpatory in nature. He should not attempt to improperly influence or sway the deliberations or to induce a result he desires. Many years ago, we said that grand jury powers should not be used as "an instrument of oppression." *Hobson v. District Court of Linn County*, 188 Iowa 1062, 1065, 177 N.W. 40, 41 (1920). Recently, we have criticized conduct similar to that engaged in here by the prosecutor in *State v. Hansen*, 215 N.W.2d 249, 250–251 (Iowa 1974). *See also State v. Good*, 10 Ariz.App. 556, 460 P.2d 662, 665 (1969).

■ However, ordinarily prosecutorial misconduct alone should not be the basis for setting aside an indictment or voiding a verdict. It is not the *misconduct* which entitles defendant to relief, it is the *prejudice* which results therefrom, making it impossible for defendant to have a fair trial. *Cf. State v. Blyth*, 226 N.W.2d 250, 271 (Iowa 1975).

Significant to our inquiry in this regard is the following statement from *United States v. Calandra*, 414 U.S. 338, 344–345, 349, 94 S.Ct. 613, 618, 38 L.Ed.2d 561, 569, 572 (1974):

"The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered.

" * * *

"Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial."

*See also State v. Hiatt*, 231 Iowa 643, 650, 1 N.W.2d 736, 740 (1942).

Several other principles are important in our consideration of the constitutional issues raised. Ordinarily, we will not consider the sufficiency of evidence considered by the grand jury. *State v. Kobrock*, 213 N.W.2d 481, 483 (Iowa 1973); *State v. Lamb, supra*, 239 Iowa at 180, 30 N.W.2d at 736; *State v. Boucher, supra*, 237 Iowa at 777, 23 N.W.2d at 854.

Furthermore, as we have previously mentioned, the only grounds upon which an indictment may be set aside are statutory and are controlled by §§ 776.1 and 773.6. However, we have recognized, at least obliquely, that these statutory provisions must give way, under certain circumstances, to constitutional safeguards. In *State v. Olson, supra*, 249 Iowa at 547, 86 N.W.2d at 221 we said:

"We have repeatedly held an indictment may be set aside only on grounds enumerated in statutes, §§ 776.1, 773.6 * * *

"Defendant argues the district court had inherent power to set aside the indictment on a ground not specified in the statutes and should have exercised it here. *We need not determine whether such power exists in an exceptional case in order to prevent oppression or violation of constitutional rights.* If it be assumed the power exists, a proper case for its exercise has not been shown here. See in this connection *State v. Manley*, 197 Iowa 46, 48–49, 196 N.W. 724; *State v. Baughman, supra*, 111 Iowa 71, 73, 82 N.W. 452." (Emphasis added.)

■ We believe this statement accurately predicted that we would set aside an indictment on non-statutory grounds upon a showing that constitutional rights had been violated. It is in this context that we consider defendant's constitutional objections.

This matter can be resolved only by a consideration of *all* the facts and by our own independent evaluation of the totality of the circumstances. We have reached this same conclusion in considering constitution-

al questions in many recent cases. *See State v. Cullison,* 227 N.W.2d 121, 126–127 (Iowa 1975); *State v. Winfrey,* 221 N.W.2d 269, 272 (Iowa 1974); *State v. Thomas,* 205 N.W.2d 717, 721 (Iowa 1973); *State v. Fetters,* 202 N.W.2d 84, 90 (Iowa 1972); *Pollard v. District Court,* 200 N.W.2d 519, 520 (Iowa 1972); *State v. Niccum,* 190 N.W.2d 815, 822 (Iowa 1971).

These cases dictate the procedure to be followed here—an independent evaluation of the totality of the circumstances in order to determine whether defendant's constitutional right to equal protection and due process has been violated.

We have reviewed the grand jury proceedings and have fully considered defendant's objections to the manner in which the grand jury inquiry was conducted by Mr. Woodward.

█ We come away from that appraisal with two firm conclusions. The first is that the prosecutor presented a considerable mass of evidence which had no proper place in the grand jury's investigation. He made frequent statements which were improper and violative of his obligation to present the matter impartially and with no attempt to influence the action of the grand jury. We express unqualified disapproval of that practice.

However, none of these facts was known to the jury which convicted defendant. That body heard only competent, relevant testimony admissible against defendant under tested rules of evidence.

The quotation from *United States v. Calandra* already set out is uniquely applicable here.

Our second conclusion is that under this record defendant was not denied due process or equal protection under the federal or Iowa constitutions.

## II. Production of Evidence

Although much of defendant's request for production of evidence was granted, he asserts he should have been accommodated even more. He claims he was denied pretrial access to information and material vital to the defense of the charge against him.

This case was tried prior to our decision in *State v. Peterson,* 219 N.W.2d 665 (Iowa 1974). Defendant concedes that decision has no application.

Defendant filed a motion for bill of particulars, which really was a motion for production of evidence. Although we have said this is not the proper method in which to obtain information before trial (*State v. Lass,* 228 N.W.2d 758, 765 (Iowa 1975), both court and counsel treated the motion as one calling for the production of evidence. We do likewise.

█ The motion was long and detailed. It contained 38 numbered requests, many of them with numerous subdivisions. After a hearing on the motion, the trial court entered an order directing the State to furnish defendant the following:

(1) Copies of all plats and sketches and copies of all written reports containing an analysis of physical evidence and scientific tests;

(2) Description of all items of real evidence pertaining to the commission of the alleged offense and of any real evidence in the possession of the State, whether or not it was to be used in the event of trial, together with an opportunity for him to examine same;

(3) Copies of all photographs relating to the commission of the alleged offense;

(4) Specific and detailed factual information concerning the testimony of 29 separate potential witnesses;

(5) Copies of written statements obtained by the State in the investigation of the case;

(6) Copies of all written statements obtained by the county attorney in his separate investigation; and

(7) A statement of names and addresses of "all witnesses the county attorney intended to call in the trial of this case and the substance of the testimony sought to be elicited from each witness;" also "additional information of the same nature as it is obtained in the future concerning other witnesses up to and including the date this matter is submitted to a jury for a determination of innocence or guilt of the accused."

We believe the trial court was quite sensitive to defendant's needs and granted substantially all of his requests except those which demanded the turnover of virtually the entire State file by seeking *all* written reports pertaining to the investigation of the case and copies of *any* recordings, tapes, written statements of witnesses or other memoranda pertaining to or having any bearing upon the commission of the alleged defense.

We have consistently rejected such broad and sweeping demands as being both too vague and too general. We hold the trial court's ruling was consistent with and justified by *State v. Lyons,* 210 N.W.2d 543, 547 (Iowa 1973); *State v. Houston,* 209 N.W.2d 42, 46 (Iowa 1973); *State v. Aossey,* 201 N.W.2d 731, 734 (Iowa 1973), *cert. denied* 412 U.S. 906, 93 S.Ct. 2292, 36 L.Ed.2d 971; *State v. Niccum,* 190 N.W.2d 815, 826–828 (Iowa 1971) and *State v. Eads,* 166 N.W.2d 766, 773–774 (Iowa 1969).

Several of defendant's complaints in this area concern the State's alleged failure to comply with the trial court's order to produce rather than the order itself. This, of course, presents a quite different problem. The trial court had the duty—and the ability—to compel the State to obey its order; but it cannot do so unless the alleged failure to obey is brought to its attention in timely fashion.

Two items of potential evidence are involved. One concerns a fingerprint (not the one from the faucet); the other deals with a number of photographs allegedly taken by one of the investigating officers.

■■■ Defendant now asserts a reproduction of the fingerprint found on a matchbook cover was not given for comparison purposes. He also says the State refused to turn over a number of photographs in its possession. He says, and we agree, this is matter he was entitled to under the trial court's order to produce evidence.

Although the record is somewhat obscure, it seems the State insists the disputed fingerprint was not sufficiently clear to provide a basis for comparison. It was not used at trial. Defendant argues *he* should have been the one to decide if the print would be helpful to his defense.

■■■ We agree with the trial court that defendant waived his right to insist on production of the fingerprint by failing to raise the State's failure to produce it until the time of trial. *See State v. Cunha,* 193 N.W.2d 106, 111 (Iowa 1972).

■■■ Concerning the disputed photographs, the trial court found there was considerable uncertainty about how many pictures were taken and by whom. The State insisted it had turned over all the photographs it had. The trial court found there was no evidence any pictures had been withheld. The court also found the additional pictures whose existence the State denied simply depicted the death room and other photographs of that area were already available for defendant's use.

There was no abuse of discretion in the trial court's ruling there was no showing the State had violated the order to produce evidence.

■■■ Defendant's most strenuous objection to the trial court's ruling on his motion for the production of evidence deals with his unsuccessful demand for copies before trial of the complete transcript of testimony of witnesses appearing before the grand jury. The gist of his complaint is that §§ 772.3 and 772.4, requiring minutes of testimony to be attached to the indictment and copies furnished to defendant, entitle him to the verbatim transcript of their tes-

timony. Defendant admits such a record need not have been kept; but, since the evidence was recorded by a court reporter, defendant argues his transcribed notes became the minutes of testimony.

We do not agree. We have construed minutes to consist of summarized statements of what the witnesses said before the grand jury. *See State v. Frommelt,* 159 N.W.2d 532, 536 (Iowa 1968); *State v. Johnson,* 259 Iowa 599, 603, 145 N.W.2d 8, 10 (1966); Annot. 20 A.L.R.3d 7 (1968); Black's Law Dictionary, Rev. 4th Ed. (1968), page 1149.

Defendant was not entitled to the production of the transcript of the grand jury testimony under §§ 772.3 and 772.4.

 Of course, defendant's right to use the transcript of a witness' grand jury testimony for purposes of cross-examination is a different matter. Despite defendant's protests to the contrary, we find he was given every possible consideration in this respect. The trial court was careful to follow the guidelines set out in *State v. Deanda,* 218 N.W.2d 649, 651–652 (Iowa 1974) and *State v. Houston, supra,* 209 N.W.2d at 46.

The record fully bears out this statement by the trial court in ruling on defendant's motion for a new trial:

"Although this court did not allow the defendant to obtain the entire transcript of the grand jury testimony, it did allow him to have the transcripts of those witnesses called by the State before cross-examination. The court did delete a few pages from said transcripts that contained hearsay, conversation of the grand jurors and the prosecutor, and other immaterial matters that were not exculpatory in nature toward the defendant. By pretrial order and as a practice during said trial, it was not called to the attention of the jury that the defendant was put in a position that he had to object to or delay the trial by obtaining the said transcripts. Many of the transcripts were given in advance to the defendant before the examination of the party

called as a witness, others were given at recesses, or the defendant agreed that he would recall the witness for further cross-examination in the event he found matters in the grand jury transcript that he wished to cross-examine on."

There was no error in the manner in which the transcripts were handled for purposes of cross-examination.

### III. Motion for Directed Verdict

Defendant moved for a directed verdict at the end of the State's case and again at the end of all the evidence. In both instances, the motion was overruled and, we believe, rightly so.

 Defendant argues the evidence was insufficient to sustain a conviction. It is quite true, as defendant argues, that most, if not all, of the evidence was circumstantial. To support a conviction based on circumstantial evidence, it is necessary that the circumstances be entirely consistent with defendant's guilt and wholly inconsistent with any rational hypothesis of innocence. It must be so convincing as to exclude a reasonable doubt that defendant was guilty of the offense charged. The proof must generate something more than suspicion, speculation or conjecture. *State v. Blyth,* 226 N.W.2d 250, 268 (Iowa 1975); *State v. White,* 223 N.W.2d 163, 164 (Iowa 1974); *State v. Sellers,* 215 N.W.2d 231, 232 (Iowa 1974); *State v. Jellema,* 206 N.W.2d 679, 681 (Iowa 1973); *State v. Schurman,* 205 N.W.2d 732, 733–734 (Iowa 1973).

 Several rules have been consistently adhered to in considering such motions based on insufficiency of the evidence. First, we view the evidence in the light most favorable to the State, including all inferences and presumptions which flow from the evidence in the record. *State v. Hansen,* 225 N.W.2d 343, 348 (Iowa 1975); *State v. Staker,* 220 N.W.2d 613, 618 (Iowa 1974). Furthermore, a finding of guilt is binding on us unless it is without substan-

tial support in the evidence. *State v. White, supra,* 223 N.W.2d at 164; *State v. Jellema, supra,* 206 N.W.2d at 681; *State v. Cartee,* 202 N.W.2d 93, 96 (Iowa 1972).

Defendant argues there is nothing to associate him with this crime except a print of his thumb found in the dead girl's room. This, he says, is insufficient since there is no showing when, nor the circumstances under which, it was impressed there. Not only does defendant underestimate the importance of this evidence, but he also overlooks completely other evidence which, combined with the print, made it incumbent upon the trial court to submit the question of defendant's guilt to the jury.

In the first place, this is not just *any* random fingerprint. It is a fingerprint found on a water faucet, the basin of which was still half filled with bloody water, in the room where Miss Ottens' mutilated body was discovered. Like all evidence, the probative value of fingerprint evidence depends upon the circumstances surrounding its discovery. *State v. Sellers, supra,* 215 N.W.2d at 232; *United States v. Van Fossen,* 460 F.2d 38, 40–41 (4th Cir. 1972); *United States v. Cary,* 152 U.S.App.D.C. 321, 470 F.2d 469, 471 (1972). Application of that test here lends unusual force to this physical evidence.

In addition to the fingerprint evidence, there was also evidence a hair consistent with the victim's was found on a tennis shoe taken from defendant's room and a hair consistent with his was found on her blouse. The admission of this evidence was strenuously objected to and is discussed elsewhere in this opinion. Since we there hold it to be admissible, we consider it here as supportive of the State's case.

Furthermore, two witnesses, Earnest Roberson and Rosemary Jones, placed defendant in Rienow Hall at the time the jury could have found Miss Ottens' death occurred. While defendant argues Rosemary Jones' testimony was not only improperly admitted but was entitled to no credibility,

he cannot say the same as to Roberson. Even as to Mrs. Jones' testimony, while we agree it was suspect, the jury could have found it credible.

Roberson was a friend and acquaintance of defendant. Like Miss Ottens, he lived in Rienow Hall. On the evening of the murder, he received two telephone calls from defendant, presumably made from Slater Hall, asking that Roberson let him into Rienow Hall, which was kept locked during certain hours. However, when Roberson started for the ground floor to open the door for defendant, he almost immediately met him on the stairway between the fourth and fifth floors. He testified unequivocally the time lapse was such that defendant could not have made the telephone call from Slater Hall and still reached Rienow Hall, even assuming someone else had let him in. It was permissible for the jury to find defendant was already in Rienow Hall when he made the calls to Roberson, a fact he was trying to conceal by the calls to Roberson.

In considering all the evidence—defendant's presence in Rienow Hall under incriminating circumstances at the critical time, the discovery of compatible hairs relating to both the victim and himself, the testimony of Roberson and Mrs. Jones, and the presence of the fingerprint—we believe there was substantial testimony from which the jury could find defendant guilty.

The case was properly submitted to the jury.

### IV. Motion to Suppress Evidence

Prior to trial, defendant filed a motion to suppress evidence. It was overruled. Although not necessary to preserve error, *State v. Liesche,* 228 N.W.2d 44, 46 (Iowa 1975), defendant unsuccessfully renewed his objections when the challenged evidence was offered at trial. Defendant assigns the admission of this evidence as error.

Several months after the commission of this crime, a search warrant issued autho-

rizing the search of defendant's room in Slater Hall for the purpose of seizing "a blue charge card, clothing and personal belongings of Sarah Ann Ottens, and clothing and personal belongings of James Wendell Hall which had blood stains on them."

A search of the room was conducted under the authority of this warrant and among the items seized was a pair of white tennis shoes suspected of being bloodstained. The dispute here centers around the admissibility of a hair found imbedded under the laces of one of these shoes which, upon analysis, was found to be consistent with hair samples taken from the head of Sarah Ann Ottens.

Defendant argues this evidence should have been suppressed. He asserts, first, that the warrant was issued without probable cause and that any evidence seized under it is rendered inadmissible thereby and, secondly, he insists the hair was inadmissible in any event for the following reasons:

(1) it was not one of the items mentioned in the information for search warrant;

(2) it was not enumerated in the search warrant itself; and

(3) it was not listed on the return made by the officer who executed the warrant.

Several other objections to the warrant and the ensuing search are urged on appeal, but they were not raised in the trial court. We confine our consideration to those issues properly raised and preserved in the trial court. *State v. Ritchison, supra,* 223 N.W.2d at 213.

We find no merit in the argument the hair was inadmissible because it was not listed in either the application or the warrant and was not inventoried in the return on the warrant.

█ It is true a search warrant must describe with particularity the items to be seized. §§ 751.4, 751.5, The Code. The executing officer is not permitted to seize one item under a warrant describing another. *Berger v. New York,* 388 U.S. 41, 58, 87 S.Ct. 1873, 18 L.Ed.2d 1040, 1052 (1967);

*Trupiano v. United States,* 330 U.S. 699, 710, 68 S.Ct. 1229, 92 L.Ed. 1663, 1672 (1948).

The cases relied on by defendant which he says make this seizure unreasonable are easily distinguishable from the case at bar. Here, neither the warrant nor the search was general or exploratory as was the case in *Stanford v. Texas,* 379 U.S. 476, 480, 85 S.Ct. 506, 13 L.Ed.2d 431, 434 (1965); nor did the officers seize one item under a warrant authorizing the seizure of another as was done in *United States v. LaVallee,* 391 F.2d 123, 125 (2d Cir. 1968); *People v. Baker,* 23 N.Y.2d 307, 296 N.Y.S.2d 745, 244 N.E.2d 232, 237 (1968).

█ Here the officers were in the process of making a valid search and were entitled to take possession of the tennis shoes under the warrant. We know of no authority, and none has been cited, which would compel officers to remove from an article rightfully seized all material attached or adhering thereto. Such a rule would be unreasonable and unrealistic.

Of course, the situation would be different if the officers, having once gained entrance to the room by virtue of the warrant, conducted an extensive and unauthorized search for property not listed in the warrant. No such action occurred here.

█ Furthermore, seizure of the hair is no doubt also permissible under the plain view doctrine. Once the officers rightfully seized the tennis shoes, the hair was observable. It was then subject to seizure as significant evidence relating to the crime under investigation. *State v. Davis,* 228 N.W.2d 67, 70–71 (Iowa 1975); *State v. Johnson,* 232 N.W.2d 477, 480 (Iowa 1975).

█ Defendant next insists that the failure to inventory the hair on the return should have excluded it from introduction as evidence. *See* § 751.14, The Code. Defendant cites no authority to support his claim. The general rule is that requirements for filing a return showing the prop-

erty seized is for the protection of the defendant's property rights and not as protection against unreasonable search and seizure under the 4th Amendment. *See* 68 Am.Jur.2d, Searches and Seizures, § 83 at 738 (1973). The rule is stated this way in *United States v. Kennedy*, 457 F.2d 63, 67 (10th Cir. 1972), cert. denied 409 U.S. 864, 93 S.Ct. 157, 34 L.Ed.2d 112 (1972):

> "The overwhelming weight of authority * * * is to the effect that the procedures required for the return of a search warrant are ministerial and, absent a showing of prejudice, irregularities in such procedures will not serve to void an otherwise valid search."

In somewhat different circumstances, we indicated in *State v. Wenks*, 200 Iowa 669, 670–671, 202 N.W. 753 (1925) that we accept the rationale of this rule. There we said:

> "If it be conceded it was the duty of the officers to give a receipt to the person having possession of the property so taken under a search warrant, the failure to do so would not deprive the state of its evidence nor render said property inadmissible in evidence merely because of the failure to execute such receipt."

*Cf. State v. Kaufman*, 201 N.W.2d 722, 724 (Iowa 1972).

■ This leaves for determination the defendant's claim that the warrant was improperly issued without probable cause. If this is true, the search is invalid and the evidence seized would have been inadmissible. Defendant argues the warrant was issued in violation of defendant's constitutional rights under Amendments 4 and 14 of the Federal Constitution and Article I, § 8 of the Iowa Constitution.

The State argues such objection is so vague and indefinite that it did not properly raise the issue now relied on. We pass that question and consider the matter on its merits.

An information asking that a search warrant issue was filed by one of the officers engaged in the investigation of this crime. It was supported by two affidavits, one by the applicant and the other by another officer engaged in the investigation. These affidavits alleged that the two officers had investigated the circumstances under which Sarah Ann Ottens died and had received information through confidential sources that James Wendell Hall was in Room 429 of Rienow Hall where Miss Ottens' body was discovered, a fact which he denied upon being interviewed by the agent; that a fingerprint found in the death room was identified as being the fingerprint of James Wendell Hall.

The officer issuing the warrant also noted on the application the following additional information taken under oath at the time the warrant was issued. Agent John J. Jutte testified his confidential sources were both male and female student friends and acquaintances of the deceased, one or more of whom had conversed with the deceased on the date of her death. Some of them had been told by the deceased that James Wendell Hall had been in Room 429 of Rienow Hall in the morning of the day of the deceased's death and that he had an appointment to return to the room in the evening; that another source placed James Hall in Room 429 of Rienow Hall on the evening of the victim's death.

■ Probable cause for the issuance of a search warrant exists when the facts and circumstances presented to the judicial officer are sufficient in themselves to justify the belief of a man of reasonable caution that an offense has been or is being committed. It cannot be based on mere conclusions, and the officer must make his own determination from the facts presented. *State v. Boer*, 224 N.W.2d 217, 219 (Iowa 1974).

We have had countless search warrant cases in recent years and the principles upon which an issuance must rest are well established and have been frequently discussed. *See State v. Boer, supra*, at 219; *State v. Lynch*, 197 N.W.2d 186, 191–192 (Iowa 1972), cert. denied 409 U.S. 1116, 93

S.Ct. 916, 34 L.Ed.2d 700 (1973); *State v. Spier*, 173 N.W.2d 854, 858 (Iowa 1970). The discussion in these cases need not be repeated here.

The main thrust of defendant's argument is that the confidential information received by the officers was not shown to have been reliable under the tests set out in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, 729 (1964) and adopted by us in *State v. Spier, supra*, 173 N.W.2d at 858.

However, those cases and others like them deal with paid or otherwise rewarded police undercover agents for whom empirical reliability is required. A distinction is made in the case of the private citizen who gives police confidential information. This matter was discussed in *State v. Drake*, 224 N.W.2d 476, 478–479 (Iowa 1974) where we said:

"When considering the sufficiency of probable cause based on information supplied by an informant, it is important to distinguish the police tipster, who acts for money, leniency or some other selfish purpose, from the citizen informer, whose only motive is to help law officers in the suppression of crime.

."In the former the information furnished is less likely to be truthful, and it is therefore subjected to much closer scrutiny as to the surrounding circumstances reflecting on its credibility. As part of this scrutiny, the informant's prior reliability must ordinarily be demonstrated.

"In the latter the role of prior reliability is considerably relaxed for several reasons. In the first place the citizen informer has rarely had any earlier experience in reporting suspected criminal activity. Furthermore, unlike the professional informant, he is without motive to exaggerate, falsify or distort the facts to serve his own ends.

"Reliability still must be shown, but it may appear by the very nature of the circumstances under which the incriminating information became known. Any other rule would lead to the totally unacceptable result that public-spirited citizens interested only in law enforcement could seldom furnish information sufficient to establish probable cause."

■■■ We believe the above discussion is applicable here. The evidence before the issuing officer shows the confidential information came from a number of students who were friends and acquaintances of Sarah Ann Ottens. Their sole motive was to assist in the investigation of this crime, and we hold the circumstances under which they gave their information is sufficient to attest to their reliability for the purpose of issuing a warrant.

■■■ We find at the time the warrant was issued probable cause had been established.

## V. *Evidentiary Rulings*

Defendant claims reversible error because of trial court rulings on the admission and exclusion of evidence in the following respects:

(1) Admissibility of photographs;

(2) Exclusion of testimony as hearsay;

(3) Admission of testimony inconsistent with information set out in bill of particulars;

(4) Failure of the State to produce exculpatory witnesses;

(5) Admission of improper rebuttal testimony; and

(6) Admission of recanting testimony of Mrs. Rosemary Jones.

We consider these in the order listed.

### *Photographs*

Defendant argues certain photographs were duplicative, produced only to enflame the jury, and that it was error to admit them. Involved are five photographs of Sarah Ann Ottens' body.

The admission of photographs is largely within the sound discretion of the trial court, and the test of admissibility is relevancy. *State v. Lass, supra,* 228 N.W.2d at 771; *State v. Hummell,* 228 N.W.2d 77, 83 (Iowa 1975); *State v. Albers,* 174 N.W.2d 649, 657 (Iowa 1970); *State v. Dillon,* 161 N.W.2d 738, 741 (Iowa 1968). The trial court was careful to avoid duplication in the admission of photographs. The exhibits objected to here were received after the court had made a determination that each portrayed some different or additional circumstance not present in other pictures.

It is quite true some of the photographic evidence was gruesome but that is because they depicted a gruesome scene. They were relevant in showing the nature and extent of the attack upon the victim and the condition of her body when found. If relevant for no other purpose, they certainly had a bearing on the issues of malice and premeditation. We find no abuse of discretion in the admission of the challenged photographs. *See State v. Dillon, supra,* 161 N.W.2d at 741.

### Hearsay

Defendant complains because the trial court sustained several hearsay objections to evidence which he says was exculpatory in nature. He asserts such rulings on this "crucial" testimony constituted reversible error.

In one case, an investigating officer was not permitted to testify he had been told by other officers blood had been found in the basement of Rienow Hall. He had no independent knowledge of this alleged fact. The court's ruling that this was inadmissible hearsay was manifestly correct.

In another instance, another officer attempted to testify to statements made by defendant which would furnish an innocent reason for his presence in Room 429 and explain how his fingerprint might have come to be on the faucet in the room. Again, there is no serious dispute that this

called for hearsay testimony. It was not shown to be within any exception to the rule, and the trial court's ruling was correct.

The last hearsay objection relates to the testimony of Agent Jutte who was asked to testify to things "revealed" to him concerning Miss Ottens' whereabouts on the afternoon of her murder and also asked to testify to several other matters which had been related to him by others. This, too, was properly excluded as hearsay.

We have considered hearsay testimony in a number of recent cases. Each of the challenged rulings was correct under these decisions. *See Tonini v. Maloney,* 228 N.W.2d 91, 93 (Iowa 1975); *State v. Lanphear,* 220 N.W.2d 618, 622 (Iowa 1974); *State v. Miller,* 204 N.W.2d 834, 840–841 (Iowa 1973); *State v. Smith,* 195 N.W.2d 673, 675–676 (Iowa 1972).

Although defendant now says the purpose of this evidence was not to prove the truth of the assertions but simply to show they were in fact made, no such claim was made at trial. Defendant therefore may not rely on that theory now. *See State v. Arnold,* 225 N.W.2d 120, 122 (Iowa 1975); *State v. Fetters,* 202 N.W.2d 84, 93 (Iowa 1972).

### Testimony Inconsistent With Bill of Particulars

Defendant asserts error occurred because Dr. Schnetzler was permitted to place the "outside limits of death" between 12:00 noon and 11:00 P.M. on March 13th, although the State had previously put that period at between 2:00 P.M. and 8:00 P.M. in its bill of particulars.

When a bill of particulars is furnished, the State is thereafter limited to proof of the acts indicated in such specifications. *State v. White,* 260 Iowa 1000, 1005, 151 N.W.2d 552, 555 (1967); *State v. Schuling,* 216 Iowa 1425, 1428, 250 N.W. 588, 589 (1933). The reason for this rule is to assure defendant against surprise and to give him

necessary information before trial as to the matters he must defend against.

At trial, Dr. Schnetzler testified time of death is "difficult to ascertain." He said there are a number of factors which are used to make this determination such as lividity, the temperature of the body, the vitreous humor of the eyes and the degree of rigor mortis.

The doctor then placed the outside limits of death, "based on my experience," at between 12:00 noon and 11:00 P.M. He immediately added the following:

> "I feel this can be somewhat narrowed to between the hours of 3:00 P.M. and 9:00 P.M. and in all likelihood the death occurred between these hours. No tests as to time of death are infallible."

■ Defendant insists this answer substantially, and prejudicially, expanded the time within which death may have occurred. However, if the *whole* answer is considered instead of only the first part, it is apparent the time difference between the bill of particulars (2:00 P.M. to 8:00 P.M.) and the doctor's testimony (3:00 P.M. to 9:00 P.M.) is unimportant under the record in this case. Perhaps Dr. Schnetzler was ultraconservative in his testimony, but it cannot be disputed he was of the opinion death occurred between 3:00 P.M. and 9:00 P.M.

In many cases the precise time of death is a vital circumstance; but not here. No effort was made to account for defendant's whereabouts during either period. The minor time difference between the bill of particulars and the testimony did not prejudice defendant. Not every insignificant variation entitles defendant to exclusion of evidence which is not identical with facts detailed in a bill of particulars.

Defendant has shown no right to relief on this ground.

### Failure to Call Witnesses Who Testified Before the Grand Jury

Defendant objects because the State failed to call as witnesses at trial several persons who testified before the grand jury. He limits his argument here to one witness, Robert Dean Jones. We restrict our discussion accordingly.

Defendant says Robert Dean Jones possessed exculpatory information and that the State was obligated to produce him as a witness. His motion to that effect was rejected. Later defendant called Jones as his witness. We discuss his testimony in detail later.

■ Two principles are involved. First, the State may not suppress exculpatory information. To do so is reversible error. *State v. Peterson*, 219 N.W.2d 665, 674 (Iowa 1974). Secondly, the State need not call every witness who testifies before the grand jury. *State v. Hinsey*, 200 N.W.2d 810, 817 (Iowa 1972); *State v. Christ*, 189 Iowa 474, 483, 177 N.W. 54, 58 (1920).

■ Defendant does not claim the State suppressed the exculpatory evidence. Indeed he was at all times aware of the information Jones had and, as heretofore noted, used Jones as his own witness. His complaint is that the State did not call this man as a prosecution witness; but the State was under no compulsion to do so. There is no merit in defendant's argument to the contrary.

### Rebuttal Testimony of John Reding

This matter is closely related to the previous discussion of the State's refusal to call Robert Dean Jones as a witness.

The controversy concerning the testimony of Robert Dean Jones and the so-called rebuttal testimony of John Reding became one of the most bitterly contested issues of the whole trial. We are unable to attach the same importance to it as did either the State or the defense. The matter arose in this way.

Robert Dean Jones, a student at the University and a resident in Rienow Hall, testi-

fied he was in the first floor corridor of that building talking with Elsie Barnes, the desk clerk at Rienow Hall, shortly after 3:00 P.M. on the day in question. He was waiting for the elevator, as he wanted to return to his room on the fifth floor to get a coat he had forgotten. When the elevator stopped on the first floor, Sarah Ann Ottens was there with an unidentified white male. (Defendant is black.) These two and Jones were the only persons on the car. As the three rode up, Miss Ottens and her companion engaged in some conversation although Jones does not recall the nature of it. They appeared to be friends, or at least acquainted, and they got off on the fourth floor together. Jones then went on up to the fifth floor.

Elsie Barnes verifies this version except that she places the time about 4:00 P.M. and she was unable to see the second person on the elevator when it stopped at the first floor. She saw Miss Ottens and she saw the arm of a second person reach out to the button panel on the elevator.

This is the sum total of Jones' testimony. Its value, of course, is to place Miss Ottens in the company of a male companion other than defendant at a critical time during the day of her death.

The State then called John Reding as a rebuttal witness. Reding was a repairman who was working on the Rienow Hall elevators on the fatal day. He testified he rode the elevators up and down a number of times during the day as he was recabling the cars. He remembered specifically one occasion which he placed at approximately 2:00 P.M., although admitting it could have been a little later, when he rode with an unidentified girl and her unidentified male companion. He knew neither of them and could not give a description of them because he had broken his glasses and had very poor vision without them.

He gave some description of the clothing the girl was wearing, which was consistent with the type of clothing Miss Ottens had on. Reding remembered the girl was carry-ing something and he thought it strange that her companion did not take this burden from her. Reding thought this couple was acquainted. He said they got off the elevator together but does not remember where. That was the substance of his testimony.

■ Although the State insists that Reding's testimony was rebuttal because it "explained" the testimony of Robert Dean Jones, we find nothing in it of a rebuttal nature. Neither do we find anything of any importance, and we think it was entirely inconsequential to any issue in the case.

Apparently the State's theory in offering this testimony was that the person Jones saw on the elevator with Miss Ottens was Reding, but the evidence conclusively refutes that conclusion.

Not only are there material differences in time sequence (Reding places his ride near 2:00 P.M. and the testimony of Jones and Elsie Barnes places their observation at anywhere from 3:00 to 4:00 P.M.), there is the additional circumstance that the young lady Reding saw was carrying a package sufficiently large he thought her companion should have helped her with it. Yet neither Jones nor Elsie Barnes remembered seeing Miss Ottens carrying anything when they observed her.

Besides the inconsistencies already noted, we point out additionally that Jones said Miss Ottens and her companion left the car together at the fourth floor. This could not have been Reding, who testified the couple he saw left the elevator together while he stayed on.

Under the evidence, Reding could not have been the man Jones saw with Miss Ottens. The two witnesses, Jones and Reding, were simply describing different events. Jones saw Miss Ottens and a man who could not have been Reding leave the elevator together. Reding saw an unidentified girl and an unidentified man leave the elevator together approximately an hour earlier.

There is nothing unusual about this kind of elevator traffic in a college dormitory building. Reding's testimony does not rebut or explain Jones' in a single detail. It was not proper rebuttal evidence.

While we think that the trial court should have rejected Reding's testimony as not being rebuttal, the decision permitting him to testify was without prejudice.

We believe the sum total of the testimony of Jones and Reding is this: Jones rode up on the elevator with Miss Ottens and an unidentified white male between 3:00 P.M. and 4:00 P.M. They got off on the fourth floor.

Reding rode up on the elevator with an unidentified girl and an unidentified male about 2:00 P.M. He does not know who they are, he cannot describe them. In that case, too, the male was not a black although he was dark skinned and may have been of Mexican extraction.

There was no reversible error here.

*Testimony of Rosemary Jones*

One of the strangest developments in this case centers around the witness Rosemary Jones, who was employed as a cleaning lady in Rienow Hall. She had testified before the grand jury and again at trial as a defense witness that she had seen a black male knocking on the door of Room 429 in Rienow Hall about 3:00 P.M. on the day of Miss Ottens' death. She said this person was not the defendant.

The day following her testimony, the prosecutor announced to the trial judge that Rosemary Jones wanted to correct her testimony because she had lied while testifying the day before. He asked permission to recall her for further cross-examination as the following proceedings out of the presence of the jury show:

"THE COURT: (to Mr. Woodward) I take it you are moving to reopen the cross-examination of the witness Rosemary Jones?

"MR. WOODWARD: That is correct, Your Honor.

"THE COURT: For the purpose of the record for what reason?

"MR. WOODWARD: For the purpose, Your Honor, that the witness Rosemary Jones has indicated that she lied on the witness stand when she was here Tuesday, and that she did know—that when she was on the witness stand she said that a person she saw at the door was not the defendant, but in actuality she did know that it was the defendant.

"THE COURT: (To Mr. Tucker) And you resist this?

"MR. TUCKER: This is not further cross-examination, Your Honor. Opportunity for examination was given, was completed, and this is as to a matter which came up subsequent to the time of her testimony, and in no way can be construed as further cross-examination, and it appears to me that recall, which I feel is erroneous to even be permitted, would have to be as their witness, because we are now talking about matters they are putting into evidence for purposes of substantive proof * * *

"THE COURT: Mr. Tucker, are you saying that the Court doesn't have authority to allow a party to reopen any matter on the trial even on direct examination or defense evidence in view of newly—

"MR. TUCKER: I am saying that the matter which is now being presented to the Court for trial purposes constitutes substantive evidence, not for purposes of impeachment, and as substantive evidence this is exactly like the question of an objection, 'Well, you want to make the witness your witness for purposes of this, you have the right to do so.' But not as a part of cross-examination, and I am stating that the Court does not have authority to declare this to be a recall for further cross-examination, that they are calling her for their purpose, for the purpose of introducing substantive evidence in this case.

"THE COURT: The Court will allow the State to recall this witness for further cross-examination."

■■■ Granting permission to recall a witness for further examination, either direct or cross, lies largely within the discretion of the trial court. We hold the ruling here was not an abuse of that discretion. *State v. Droste,* 232 N.W.2d 483, 488 (Iowa 1975); *Potter v. State,* 257 Ind. 370, 274 N.E.2d 699, 701 (1972); *State v. McAdams,* 83 N.M. 544, 494 P.2d 622, 624 (1972); *Commonwealth v. Crosby,* 450 Pa. 68, 297 A.2d 114, 116 (1972); *Harvey v. State,* 485 P.2d 251, 254 (Okl.Cr.1971); *State v. Summa,* 5 Conn.Cir. 78, 242 A.2d 94, 96 (1968); 98 C.J.S. Witnesses § 365 (1957).

Bearing on this question, too, is the rule that the scope of cross-examination lies within the sound discretion of the trial court. *State v. Everett,* 214 N.W.2d 214, 219 (Iowa 1974); *State v. Hinsey,* 200 N.W.2d 810, 816 (Iowa 1972); *State v. Harrington,* 178 N.W.2d 314, 316 (Iowa 1970).

The trial was still in progress, the evidence had not been closed, and refusal to permit a witness who volunteered she had perjured herself the opportunity to correct her false testimony under such circumstances would seem to be a grave injustice. Defendant cites *State v. Compiano,* 261 Iowa 509, 154 N.W.2d 845 (1967) as contrary authority. However, that case presents an entirely different factual situation. In *Compiano* the trial had been completed, the jury had returned a verdict of guilty, and thereafter defendant filed a motion for a new trial on the ground of newly discovered evidence. His newly discovered evidence was that one of the witnesses had recanted his testimony. We refused to grant a new trial, taking into account the whole record, the nature of the testimony to be recanted and the fact that it was not properly newly discovered evidence. We concluded the defendant had been afforded a fair trial and was not entitled to another. *Id.* at 851–852.

We reject defendant's claim the court erred in permitting the State to recall Rosemary Jones for further cross-examination.

### VI. Instructions

Defendant also raises objection concerning instructions, both those given and those refused.

His first assignment is directed toward Instruction No. 14, which discussed the essential elements of first degree murder and then stated that an inference of premeditation was permissible where an opportunity to deliberate was shown. The instruction then added:

"This inference is not conclusive, but may be considered by you with all of the evidence in the case, or lack of evidence
* * * *"

Defendant claims this is reversible error because it incorrectly shifts the burden of rebutting the inference of premeditation from the State to defendant. He relies on *State v. McGranahan,* 206 N.W.2d 88, 92 (Iowa 1973) and *State v. Boyken,* 217 N.W.2d 218, 219 (Iowa 1974). *See also State v. Hansen,* 225 N.W.2d 343, 346–347 (Iowa 1975).

In these cases, we held it reversible error to instruct on *reasonable doubt* without limiting the reference to lack of evidence to the State's case. We said it was reversible error to leave the impression the jury might consider *defendant's* failure to produce evidence in considering reasonable doubt because such a conclusion would place an unconstitutional burden upon him.

We have recently considered the argument now made by defendant. In *State v. Lass,* 228 N.W.2d 758, 766–767 (Iowa 1975), we said:

"Defendant contends that the court should have used the words lack or absence of evidence 'by the State', but we do not believe the jury could have understood that defendant had any burden of proof. In the reasonable doubt instruction this very point was made clear and the other instructions on the elements of

criminal homicide expressly placed the burden on the State on every element. The court did not use the language held noxious in *State v. Hansen,* 203 N.W.2d 216, 218 (Iowa)."

 We believe that same reasoning applies here. The court was careful to place the burden of proof on the State in the reasonable doubt instruction. It did the same when instructing on the elements of the crime. There is no possibility the jury could have been confused concerning burden of proof.

Defendant also challenges the instruction on venue. He says the trial court erred by refusing to give his requested instruction explaining that issue in specific evidentiary terms. The court gave the following instruction on venue:

"The law provides that all crimes must be prosecuted in the county where the crime was committed. The burden is upon the State to establish beyond a reasonable doubt that any crime charged in this case was committed in Johnson County, Iowa."

In another instruction the jury was told:

"The State must establish by the evidence beyond a reasonable doubt each of the following propositions: (1) that on or about March 13, 1973, in the County of Johnson and State of Iowa, the defendant did unlawfully inflict injuries upon the body of Sarah Ann Ottens."

 We find no merit in this argument. During trial, defendant conceded the venue instruction as given was a proper statement of the law. He contends, however, it should have been more specific because of the peculiar circumstances of this case. The matters now urged by defendant were adequately covered in other instructions.

Defendant's complaint is without merit.

Defendant also argues reversible error in the court's refusal to give three requested instructions.

The first dealt with specific testimony of Andrew Newquist with relation to the fingerprint; the second referred to specific evidence in connection with the hairs found on defendant's shoe and the victim's blouse; and the last asked that an instruction be given to the effect defendant's presence at the scene of the crime is not alone sufficient to warrant a conviction.

 The first two of these requested instructions, if given, would have constituted judicial comment of doubtful propriety on the evidence. *State v. Milliken,* 204 N.W.2d 594, 596 (Iowa 1973); *State v. Gillespie,* 163 N.W.2d 922, 927 (Iowa 1969). The last was adequately covered by the general instructions as to what the State must prove in order to convict defendant.

There was no error in the trial court's refusal to instruct according to these requests.

Defendant's final complaint about the instructions is the court's refusal to instruct on impeachment. The court gave the usual credibility instruction. Defendant did not request an impeachment instruction but now argues the trial court should have so instructed on its own motion.

 Defendant fails to pinpoint the impeachment evidence which was so important the court should have given, sua sponte, such an instruction. Without deciding if an impeachment instruction should have been given if requested, we hold it was not error to omit such an instruction in the absence of a request.

 The trial court must instruct on all issues important in the jury's consideration of the case whether requested to do so or not. *State v. Ritchison,* 223 N.W.2d 207, 211 (Iowa 1974); *Elkader Coop. Co. v. Matt,* 204 N.W.2d 873, 876, 877 (Iowa 1973). We hold the instructions given in the present case meet that test.

### VII. Prosecutorial Misconduct

One of the grounds relied on by defendant for a reversal of the conviction is al-

leged prosecutorial misconduct. He states this occurred in three separate areas—opening statement, presentation of evidence, and final argument. We consider the alleged errors in that order. Other prosecutorial misconduct is alleged with reference to grand jury proceedings. This has been considered separately under *Grand Jury Proceedings.*

■ It is not the prosecutor's misconduct which entitles a defendant to relief; it is the *prejudice* resulting from that misconduct which does so. Ordinarily there must be a showing of prejudice before the prosecutor's actions will result in a reversal. *State v. Lass,* 228 N.W.2d 758, 769–770 (Iowa 1975); *State v. Blyth,* 226 N.W.2d 250, 272 (Iowa 1975); *State v. Hansen,.* 225 N.W.2d 343, 349 (Iowa 1975); *State v. Williams,* 217 N.W.2d 573, 575 (Iowa 1974); *State v. Ampey,* 210 N.W.2d 433, 435–436 (Iowa 1973).

### Prosecutorial Misconduct—Opening Statement

In several respects defendant's complaints about the opening statement are without factual foundation. He says that the Assistant Attorney General misstated what he could prove when he mentioned another blow upon the decedent's body which came after her death "to an organ, I believe the kidney, as I recall it." There was testimony of such a blow from Dr. Schnetzler. He stated that there was an injury either to the kidney or the liver which resulted from a sharp blow on the abdomen, probably inflicted after death.

Defendant also objected because the prosecutor mentioned the presence of fecal matter on decedent's face when her body was discovered. There was evidence to substantiate this statement in the autopsy report received in evidence.

In the opening statement mention was made that a hair taken from defendant's tennis shoe would be shown "beyond a reasonable doubt" to have come from Sarah Ottens. Objection was made to this state-

ment, and the jury was admonished to disregard the prosecutor's remarks as to proof.

■ Defendant argues the State designedly made the claim it could prove the source of this hair beyond a reasonable doubt when it knew the evidence at best could only show it could have been hers—that it was "consistent" with her hair type. While the prosecutor overstated himself, there is no indication this was done in bad faith, the matter was promptly stopped, and an appropriate instruction given that it should be disregarded. No prejudice resulted from this statement.

■ We reach the same conclusion concerning the objection that the prosecutor stated there was no eyewitness identification. No objection was made to this statement. Without extended discussion, we hold the context in which this was said leaves some doubt as to whether it was factually inaccurate; and in any event, it was not prejudicial, even if wrong.

The final objection to the opening statement concerns the prosecutor's reference to an interview conducted by John Jutte, an investigator for the Bureau of Criminal Investigation. This was referred to briefly. Defense counsel objected to the statement. No ruling on the objection was made but the court directed counsel to discontinue that course, which he did. The complaint urged is that this reference was in disregard of the court's ruling on defendant's motion in limine. This is not correct. The motion in limine was overruled with regard to any statements made by defendant to Mr. Jutte.

All of the above matters were considered by the trial court in ruling on defendant's motion for new trial. As to those few instances in which there was some misstatement of fact, whether inadvertent or intentional, the matter was so minor and immaterial that no prejudice resulted and the trial court properly ruled in that manner.

*Prosecutorial Misconduct—Presentation of Evidence*

The objection to this part of the prosecutor's conduct takes three courses, all of which involve the use of exhibits.

■ A broom found in the victim's room had been identified as the possible murder weapon. It was admitted into evidence. Defendant objects because he says this exhibit was allowed to stand for some time in full view of the jury after Dr. Schnetzler's testimony. We find no reviewable issue here. The record does not disclose the factual situation defendant relies on nor does it show any objection made at the time the alleged error occurred. Error, if there was any, was waived. *See State v. Rutledge,* 243 Iowa 179, 198, 47 N.W.2d 251, 263 (1951).

■ The State had prepared a sketch of a man supposed to have been in Rienow Hall during the afternoon in question. During the testimony of Mr. Reding, the prosecutor exhibited this sketch (which had previously been admitted into evidence) to the witness for purposes the record does not disclose. The court immediately stopped this attempt, and there the matter ended. No prejudice resulted therefrom.

The third complaint involves a tennis shoe allegedly belonging to defendant. The prosecutor attempted to show that an injury to Miss Ottens' head could have been inflicted by a kick from a person wearing such a shoe. The shoe itself had been admitted into evidence. During Dr. Schnetzler's testimony, the prosecutor had him examine the shoe and then attempted to elicit from him the opinion that the head injury could have resulted in the manner suggested.

Objection to this testimony was sustained. The prosecutor persisted with several additional questions concerning this matter. Objections were consistently sustained. Defendant assails the prosecutor's conduct as being a deliberate attempt to violate the trial court's rulings. Apparently the trial court did not so regard it, and neither do we.

■ The basis for the exclusion of this evidence was that it was too speculative. We are unwilling to say counsel may not try, within proper limits, to cure that objection, if he can do so. As we view the record, this is what he tried to do. Even though unsuccessful, he did not exceed the bounds of proper inquiry into his possibility of doing so. The circumstances here, despite defendant's claims to the contrary, do not run afoul of the rules outlined in *State v. Levy,* 160 N.W.2d 460, 464–468 (Iowa 1968) or *State v. Haffa,* 246 Iowa 1275, 71 N.W.2d 35, 42 (1955), cert. denied 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801.

*Prosecutorial Misconduct—Closing Argument*

The objection to counsel's statements in closing argument involves two specific areas.

■ First, counsel attempted to argue to the jury that they should view their task with one eye on what happens if they did not "do their duty to protect society." Objection was made and sustained. This argument was thereupon abandoned. The jury was instructed to disregard such comments.

Without attempting to say whether the argument itself was improper, we believe error was averted by the prompt ruling of the court and the cautionary instruction to the jury.

The second matter involves a more serious question. In closing argument, the prosecutor made the following statement:

"You do not have to accept the version that he [defendant's counsel] gave as to why the defendant didn't take the stand; you don't have to accept that. You can use any reason that you feel, and I feel I can comment since he pointed out that he didn't take it because the evidence was weak. That is their version."

■ Defendant made no objection to this argument until his motion for new trial and ordinarily would hold he had waived any right to raise the issue by failing to register timely complaint. *State v. Nelson,* 234 N.W.2d 368 (Iowa, filed October 15, 1975); *Andrews v. Struble,* 178 N.W.2d 391, 401–402 (Iowa 1970). However, we nevertheless consider it because this statement alone, if indefensibly made, would be grounds for reversal. *Griffin v. State of California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, 109 (1965); *State v. Phillips,* 226 N.W.2d 16, 18 (Iowa 1975); *State v. Osborne,* 258 Iowa 390, 391, 139 N.W.2d 177, 178 (1965).

The State claims this comment, admittedly prejudicially erroneous under ordinary circumstances, was made in response to the defendant's closing argument. The State relies on the "invited error" principle, a doctrine recognized by many courts, including ours. *State v. White,* 225 N.W.2d 104, 106 (Iowa 1975); *State v. O'Kelly,* 211 N.W.2d 589, 597 (Iowa 1973); *State v. McPherson,* 171 N.W.2d 870, 874 (Iowa 1969); *State v. Sage,* 162 N.W.2d 502, 503 (Iowa 1968); *State v. Arredondo,* 111 Ariz. 141, 526 P.2d 163, 166 (1974); *State v. Bickham,* 239 La. 1094, 121 So.2d 207, 214 (1960), cert. denied 364 U.S. 874, 81 S.Ct. 123, 5 L.Ed.2d 98 (1960); *Commonwealth v. Darnell,* 179 Pa.Super. 461, 116 A.2d 310, 312 (1955).

■ In the present case, defense counsel, in closing argument, made this statement:

"You will be specifically instructed that you are not entitled to basically use anything by way of conjecture, speculation or suspicion. * * * You could have feelings in this case insofar as the guilt or innocence of the defendant; this is not sufficient. The defendant in this case is entitled to and you have got to recognize that the presumption of innocence does exist, and it must exist in order for our law and in order for our courts to operate, and that if this does not exist then basically the society structure upon which this entire area is based would fall, and you are going to be instructed that he is entitled to his. *You are also going to be instructed upon the fact that the defendant has chosen not to take the witness stand in this case and that this is also a right which is guaranteed to him, and that the presumption of innocence still exists and you cannot use this against him. The evidence in this case was not sufficient upon which anything rested which required basically answers to any matters which had been raised."* (Emphasis supplied.)

Although carefully and ingenuously worded, this statement was clearly designed to persuade the jury defendant did not testify because the case against him was so weak it was unnecessary for him to do so. The impression counsel wanted to leave with the jury was that, had there been any evidence which required explanation, defendant would have taken the stand.

The State was entitled to point out there may have been reasons other than the one mentioned for defendant's failure to testify. This was done in a restrained and temperate manner.

If defendant wants the benefit of his own explanation for failing to testify, he must risk the danger inherent in the State's right to answer that argument. The State need not sit mute and let such a self-serving statement go unchallenged. We believe the matter comes clearly within the doctrine of invited error, and that defendant may not now rely upon it for reversal.

In considering this matter, we note defense counsel made no objection to this argument at trial. Apparently he thought it was proper response at the time.

We find no reversible error in the matters raised concerning prosecutorial misconduct.

## VIII. Jury Misconduct

Defendant asserts he is entitled to a new trial because of jury misconduct. His claim

is based upon three separate incidents: (1) Juror Housel's admission he doubted his ability to act impartially; (2) several jurors drove past Rienow Hall during the trial; and (3) some of the jurors had an alcoholic drink at dinner on the night the case was under jury consideration.

As to the prejudicial knowledge possessed by Juror Housel, we agree with the trial court that this matter was sufficiently dealt with by promptly excusing the juror from further duty. Apparently this man had information which, if communicated to the other jurors, would have been prejudicial. Housel said he did not discuss this matter with the other jurors and did not communicate his information to them. There is nothing to indicate anything to the contrary.

When the matter first came to the attention of the trial court during the course of the trial, the court promptly conducted a hearing to ascertain if such information had been passed on to other jurors. There was not a scintilla of evidence that it had. At the conclusion of the hearing, the court dismissed Juror Housel and replaced him with an alternate juror. The matter was handled promptly and expeditiously as soon as the trial court learned of Housel's misgivings. There was no prejudice to defendant, and we find no merit in his complaint.

The next charge of improper jury conduct is based on the fact several jurors rode past Rienow Hall during the trial. It is difficult to see how the mere observation of the exterior of a building such as Rienow Hall could prejudice the jury deliberations. It is only when such conduct results in prejudice that a new trial should be granted. *State v. Feddersen,* 230 N.W.2d 510, 514 (Iowa 1975); *Osterfoss v. Illinois Central Railroad,* 215 N.W.2d 233, 237–238 (Iowa 1974); *State v. Houston,* 209 N.W.2d 42, 45 (Iowa 1973); *State v. Jackson,* 195 N.W.2d 687, 690 (Iowa 1972). *See also Townsend v. Mid-America Pipeline Co.,* 168 N.W.2d 30, 36 (Iowa 1969); *State v.*

*Little,* 164 N.W.2d 81, 83 (Iowa 1969). *Cf. King v. Barrett,* 185 N.W.2d 210, 213 (Iowa 1971).

We believe the trial court properly ruled against defendant on this alleged error.

Defendant next asserts eight of the jurors drank alcoholic beverages at dinner after the case had been delivered to them for determination. The background of this alleged error is as follows: Jury deliberations began at approximately 3:00 P.M. on May 23, 1974. The jurors deliberated until approximately 5:30 P.M., when they went to dinner in a body. They returned to the courthouse at approximately 7:30 P.M. A verdict of guilty was returned at approximately 9:30 P.M. The jurors ate at the University Athletic Club. Each of eight jurors had a cocktail, and apparently the bailiff in whose charge they were committed had a beer.

In earlier days, the mere fact that intoxicants had been consumed by jurors would have required a new trial without a showing of prejudice. *See State v. Reilly,* 108 Iowa 735, 737, 78 N.W. 680, 681 (1899); *Hopkins v. Knapp & Spalding Company,* 92 Iowa 212, 214, 60 N.W. 620 (1894); *Ryan v. Harrow,* 27 Iowa 494, 502 (1869); and *State v. Baldy,* 17 Iowa 39, 41–43 (1864).

However, later cases demand proof of prejudice before a verdict is set aside because the jurors drank intoxicating liquor. In *State v. Phillips,* 212 Iowa 1332, 1336–1337, 236 N.W. 104, 106 (1931), it was held the extent and effect of drinking by the jurors are matters of fact for the trial court to decide within its sound discretion in determining if prejudice is shown. Except for abuse of discretion, we will not interfere with that decision.

In the present case, the trial court gave this matter careful consideration. It denounced the use of intoxicants but found that defendant was not denied a fair trial— the ultimate question. There is no claim any juror was intoxicated. Defendant relies solely on the *fact* of drinking rather

than prejudice resulting therefrom. The trial court observed the jurors as they returned their verdict and remarked that it was apparent from their conduct and demeanor they had solemnly considered the case and that "their decision weighed heavily upon them."

The prevailing view is that drinking alone, without a showing of prejudice, will not suffice to avoid a verdict. 75 Am. Jur.2d § 996; Annot. 7 A.L.R.3d 1040, 1050 (1966). The current trend is to examine the circumstances to determine if prejudice resulted from this jury misconduct. *See Laudermilk v. State,* Okl.Cr., 494 P.2d 341, 343 (1972); *Curtis v. Grifall,* 84 Nev. 375, 441 P.2d 680, 681 (1968); *McDuff v. State,* 431 S.W.2d 547, 550 (Tex.Cr.App.1968); *State v. Ovitt,* 126 Vt. 320, 229 A.2d 237, 240–241 (1967); *Kealoha v. Tanaka,* 45 Haw. 457, 370 P.2d 468, 475–477 (Haw.1962); *Trent v. Commonwealth,* 292 Ky. 735, 166 S.W.2d 1002, 1004 (1943). *Cf. State v. Houston,* 209 N.W.2d 42, 45 (Iowa 1973).

It is indeed unfortunate this incident occurred. It was perhaps more misconduct on the part of the bailiff than on the part of the jurors.

It would be far better if jurors conscientiously avoided the use of intoxicants while serving as jurors. Such conduct can only raise uncertainty in a defendant's mind as to the jury deliberations which resulted in his conviction.

On the other hand, the controlling test is whether defendant was denied a fair trial. If a juror's judgment is affected by alcohol during consideration of a case, the result should not stand. No such showing was made here, nor is any asserted.

■ We unequivocally condemn drinking of alcoholic liquor by jurors while a case is under their consideration. It amounts to jury misconduct. However, we cannot say the ingestion of a single cocktail by each of eight jurors before or with their dinner approximately three hours before they reached a verdict had any influence, however remote, on the result.

The trial court reached this conclusion, and we agree with it. If there were *any* evidence to the contrary, our conclusion would necessarily be otherwise.

We find no reversible error in any of the matters raised by defendant concerning jury misconduct.

IX. Defendant was vigorously and ably defended at trial. That same diligence has marked the presentation of his case on appeal. All matters urged by counsel have been considered, whether separately discussed or not. We find no reversible error, but we find also one unresolved question demands further proceedings.

It concerns defendant's post-trial motion (filed prior to his motion for new trial) asking that the State be ordered to turn over "all transcripts of proceedings before the Johnson County Grand Jury, all statements taken from any persons interviewed by the State of Iowa or any of its law enforcement agencies, whether in writing signed by such person, mechanically recorded or transcripted, or a statement which could be called the person's own words; and all police reports made or compiled in connection with the investigation and subsequent proceedings in this case for the sole purpose of allowing a review thereof to determine whether or not exculpatory material is present which would mandate a new trial in this case."

This was denied by an order containing the following statement:

"Defendant's application for production of transcript and statements is overruled. If defendant can specifically state which statements and which transcripts in particular he wishes to be examined in camera by the court, and what type of evidence the defendant feels is exculpatory, the court will reconsider the application."

Thereafter defendant's counsel orally explained the purpose of his motion, which the trial court stated would be considered as a motion to reconsider the above ruling. In

considering defendant's application, including the oral explanation, it is apparent he was really seeking the remaining grand jury transcripts which had been previously denied him, abandoning any claim for. the other information originally demanded.

██ ██ We have held a defendant is not entitled to all information in the prosecutor's file and that dragnet requests for information are properly refused. *State v. Houston,* 209 N.W.2d 42, 46 (Iowa 1973); *State v. Cunha,* 193 N.W.2d 106, 111–112 (Iowa 1972); *State v. Eads, supra,* 166 N.W.2d at 774. We hold this rule applies whether the application is made before or after trial. Clearly defendant's original demand for the State's entire file was too broad.

However, the same cannot be said of his revised request made in response to the trial court's suggestion that he narrow his sights.

In considering this matter we keep in mind the need for grand jury secrecy is not as critical after trial as it is before. *See State v. Sparks,* 85 N.M. 429, 512 P.2d 1265, 1267 (1973); *cf. People v. Wimberly,* 384 Mich. 62, 179 N.W.2d 623, 626 (1970) and *Parlapiano v. District Court,* 176 Colo. 521, 491 P.2d 965, 967–968 (1971). *See also* ABA Standards, Discovery and Procedure Before Trial, § 2.1(a)(iii) and commentary (1969). Although we have never squarely decided the question now posed, we touched on it in *State v. Niccum, supra,* 190 N.W.2d at 827–828.

██ We believe defendant should have been allowed an opportunity to ascertain if the grand jury transcripts disclosed suppression of exculpatory evidence.

If such evidence has been suppressed, defendant is entitled to a new trial. *State v. Houston, supra,* 209 N.W.2d at 47; *State v. Peterson, supra,* 219 N.W.2d at 674; *cf. Johnson v. Superior Court, supra,* 132 Cal. Rptr. 36, 539 P.2d 796 (1975); *People v. Duncan,* 388 Mich. 489, 201 N.W.2d 629 (1972). However, until this reversible error is demonstrated, defendant is not entitled to relief. Therefore we need not now grant a new trial; we need only adopt procedures which permit a determination of the critical question—was exculpatory evidence suppressed.

In other contexts we have ordered a limited remand for determination of related questions before deciding if further remedies were in order. *State v. Fryer,* 226 N.W.2d 36, 39 (Iowa 1975); *State v. Mayhew,* 170 N.W.2d 608, 614 (Iowa 1969); *State v. White,* 260 Iowa 1000, 1004, 1010, 151 N.W.2d 552, 557–558 (1967); *cf. State v. Thornburgh,* 220 N.W.2d 579, 586–587 (Iowa 1974); *State v. Deanda,* 218 N.W.2d 649, 651–652 (Iowa 1974).

We are convinced a similar procedure should be followed here. We therefore remand the case to the trial court with directions that an *in camera* inspection of grand jury transcripts be made in the presence of counsel for defendant and for the State. *State v. Mayhew, supra,* 170 N.W.2d at 614; *cf. State v. Deanda, supra,* 218 N.W.2d at 651.

We are really concerned with only about 275 pages of a total of 1250 pages of grand jury transcript. The remainder was already available to defendant before and during trial.

If such inspection discloses exculpatory evidence was suppressed, a new trial shall be granted. If not, the judgment shall stand affirmed. This is the practice approved in *State v. White, supra,* 260 Iowa at 1010, 151 N.W.2d at 557.

Of course, defendant's right to appeal from the trial court's *in camera* determination is preserved.

Affirmed on condition and remanded with instructions.

All Justices concur.