Douglas Robert POLLY, Appellee,

v.

STATE of Iowa, Appellant.

No. 83–1095.

Supreme Court of Iowa.

Sept. 19, 1984.

Thomas J. Miller, Atty. Gen., Joseph P. Weeg, Asst. Atty. Gen., Michael P. Jensen, County Atty., for appellant.

Robert L. Sikma, Sioux City, for appellee.

REYNOLDSON, Chief Justice.

Despite his failure to challenge his 1975 murder conviction by direct appeal to this court, petitioner Douglas Robert Polly was granted postconviction relief on June 17, 1983. District court set aside his conviction and ordered a new trial. The State appeals from that decision and we reverse.

April 21, 1975, a Monona County grand jury indicted Polly for his wife's murder. The minutes of testimony disclosed the State had evidence that at about 7:30 p.m. on March 28, 1975, Polly returned to the Onawa grocery store where he had worked until 6 p.m. He purchased five 100-pound burlap bags for five cents each. Sometime after 6 p.m. on that date, several large cardboard boxes were placed near the door of the Polly home in Onawa. At about 9:10 p.m. on the same evening, Polly telephoned a local funeral director. He reported his wife had died, furnished the street address, and requested the director to come to the home and pick up the body. The director asked Polly if he had called a doctor. Polly responded he would call Dr. Bill Garred.

At 9:50 p.m., Polly arrived at the public safety center. He told an officer he wanted to give himself up, and stated, "I think I killed my wife, my wife is dead." Law officers and Dr. Garred who proceeded to the home found Mrs. Polly dead on the bathroom floor. Her nude body was covered partially by a bedspread and burlap bags. She had been cut in the left breast and right side. Her throat had been cut and she had been shot through the head by a bullet exiting her left eye. There was blood in the bathtub and a bullet hole in the wall about six inches above the tub. Following autopsy a pathologist concluded the victim suffered the bullet wound first, was still alive when the cutting occurred, and any one of the three major wounds could have caused her death.

At the crime scene officers found a .22 caliber rifle in the bedroom, .22 caliber shells on the bedroom floor, a spent .22 cartridge on the kitchen table, and a spent .22 slug in the bathroom wall above

the tub. A butcher knife with the victim's blood type on it was found in a paper sheath in a kitchen cabinet. There was no sign of struggle in the house.

The grand jury evidence further disclosed that back at the public safety center, Polly, although apparently emotional and distraught, told other officers (who administered the *Miranda* warning) that he and his wife were arguing, "[h]er place was in the home, she didn't want to stay home." He stated he did not want her to work away from the home. Polly recalled having a knife in his hand and stabbing her. When asked if he remembered shooting his wife, he replied "[j]ust pointed at her." Polly stated he needed psychiatric help. He correctly stated his age, twenty-four, and the age of his eighteen-year-old wife. There was blood of the victim's type on his trouser legs and shirt. Although this was also Polly's blood type, he had no cuts or abrasions on his body. Upon laboratory analysis, Polly's blood tested negative for alcohol, "amphetamine, barbiturates, opiates and other common stimulates and depressants."

At about 10:30 p.m. on the evening of the homicide, an experienced Onawa attorney, Robert D. Prichard, became involved in the case, representing Polly. Preliminary information lodging an open charge of murder against Polly was filed the next day, March 29, 1975. Arraignment was held March 31, 1975. At that time the county attorney presented an application requesting that Polly's custody be placed in "the Superintendent of the Iowa Security Medical Facility at Oakdale, Iowa, for evaluation as to his legal sanity during the commission of said murder and at the present time for purposes of standing trial, and for psychiatric treatment, if necessary." Defendant appeared with his attorney, Prichard, and waived preliminary hearing. The record shows the "defense" agreed to the county attorney's application for psychiatric evaluation. Pursuant to this agreement and an implementing order, Polly first was held at the men's reformatory at Anamosa, then transferred to the Oakdale facility on April 3, 1975. June 5, 1975, Dr. Paul L. Loeffelholz, clinical director, wrote an evaluation report addressed to "Presiding Judge, Third Judicial District of Iowa, Monona County Courthouse."

This evaluation was lengthy and detailed. The doctor reported that on admission Polly displayed some emotional instability relative to his predicament, but was well aware of his charges and the possible consequences. A physical examination was normal, as was an electroencephalogram. He had no history of significant mental illness, but was slow mentally, having an IQ of 79, and had a history of personality weaknesses in that he lacked self-confidence and tended to be overly dependent. Polly "had a strong tendency to avoid dealing with unpleasant experiences." He indicated he and his wife were having a disagreement and claimed he had a "picture" of himself holding the gun and also a "picture" of some physical involvement with his deceased wife. He denied any memory for any significant animosity, hatred or malice toward his wife. Finally, Dr. Loeffelholz expressed the following conclusions:

> Mr. Polly is competent to participate in judicial proceedings, as he is well aware of the nature and quality of the charges placed against him and the consequences if found guilty. He is aware of the proceedings which must take place in order to resolve these matters. This man is now sufficiently emotionally stable so as to be able to participate in these judicial proceedings. He has the capacity to remain in confinement in his local community pending completion of these matters. ...

> It is this examiner's impression that Mr. Polly was experiencing a multitude of feelings at the time of his discussion with his wife on the evening of March 25, [28] 1975. There is no evidence that he was suffering from any major psychiatric illness at that specific time. It is impossible to accurately state just what did happen at the time of the alleged fatal assault. It is my feeling that his feelings of frustration, disappointment, and irritability at not being able to effec-

tively organize his life, as well as his feelings of abandonment by his wife (going to work), all contributed to impulsive, unpremeditated acts of aggression towards an individual for whom he had primarily positive feelings. Nevertheless, the record appears to indicate that he had the capacity to use a gun and knife in a manner which allegedly resulted in the death of his wife. It is this examiner's belief that this behavior indicates sufficient capacity to form intent consistent with accountability for his alleged illegal acts. The degree of accountability is a matter which will need to be decided on all of the evidence available to the Court.

Polly was returned to the Monona County jail on June 11, 1975. June 26, 1975, he was arraigned in district court. He was found financially unable to employ counsel after being orally examined under oath by the court. Polly selected Robert D. Prichard (who was present) to be his attorney and the court made the appointment. Polly pled not guilty and acknowledged receipt of a copy of the indictment. A date was set for hearing on a motion to reduce appearance bond.

August 6, 1975, Polly and attorney Prichard again appeared in district court, Judge R.K. Brannon presiding, requesting leave of court to change the plea from not guilty to guilty. Years later attorney Prichard testified that, "I had originally advised him of his probabilities of trying the case and explored with him what I thought was a defense, but it was his election to plead and accept the plea bargain that was offered us." The calendar entry [1] for the August 6 hearing is signed by the judge and states, "Defendant is advised of his right to trial and other rights as set forth in *State v. Sisco*, [169 N.W.2d 542 (Iowa 1969)]; Defendant states plea is voluntary, without promise or coercion and is made after consultation with his attorney." Not all of these proceedings, however, appear in the hearing transcript. With reference to the *Sisco* requirements, there appears only the court's warning to Polly that by his plea he was waiving trial, which the latter acknowledged.

The court also made reference to the degree-of-guilt hearing then required by Iowa Code section 690.4 (1975). *See* Iowa Code Ann. § 690.4 (West 1950) (repealed 1976). In this connection the court stated the letter from Oakdale "informed us this is not premeditated," that if the examining doctor could not appear the court wanted Polly "to read that letter and let us use it in court to show the degree of guilt." To this attorney Prichard replied, "The letter was addressed to the court for that reason." Sentencing hearing was set for August 20, 1975.

Following this court appearance attorney Prichard did some "judge-shopping," later testifying that "I talked to two or three different judges, and we finally settled on Judge Brannon, who indicated that he would give—impose a thirty-year sentence."

At the hearing on August 20, 1975, Polly again was given the opportunity to retract his guilty plea, although the court stated it "tentatively" had accepted it. The record indicates the court had taken into consideration Dr. Loeffelholz's letter on the degree-of-guilt issue. District court informed Polly:

Murder in the first degree carries a mandatory life sentence. Murder in the second degree can carry a life sentence or it can carry a term of years. The County Attorney has informed me and your defense lawyer that if you plead guilty and it is determined that it was second degree that he would ask for life or at least a term of over 40 years. Your attorney has talked to other judges, and one did say he would entertain a possibility of a 20 year sentence. I disagreed to that and I have agreed with plea bargaining on the part of your attorney if you

---

1. This entry apparently was prepared by Polly's counsel under an instruction from the court to "make a sheet out."

entered a plea of guilty. And, of course, the doctor's report shows, the State's own psychiatrist, that this was not a premeditated crime. So it has to be second degree. That I would agree to a term of 30 years against the wishes of the County Attorney.

Responding to questions, Polly stated he was satisfied with the work his attorney had done in his behalf and he was satisfied with a 30-year sentence. Between the judge and county attorney, Polly was told he had a right to trial before a 12-person jury that must reach a unanimous verdict to convict, he had a right to be present during the testimony of the State's witnesses and the right to cross-examine them, he would be presumed innocent until proven guilty, and he had the right to remain silent or to testify in his own behalf. Following all this, Polly was given about 45 minutes to decide whether he wanted "to stay with the plea of guilty." At the end of that time, he again asserted he did not want to change his plea. He then was sentenced to be committed to the men's reformatory at Anamosa for a period of 30 years.

After orally imposing the sentence, the court thoroughly advised Polly regarding his appeal rights:

Now, you have a right to appeal even though you have entered a plea of guilty, and your attorney will be glad to handle that appeal. In order to perfect an appeal, you must serve written notice on the County Attorney within 60 days that you wish to appeal this case. The State will pay the costs of the appeal, the transcript and your attorney fees if you wish to appeal. That is a decision you alone can make. If you want any more advice, your attorney will be glad to advise you on this matter.

Eight years later Polly's counsel testified:

I believe I told him at that time that—more or less what the procedure would be if he desired to appeal. But you understand that we had more or less set up this plea bargain. We knew what the sentence was going to be ahead of time, and it was just a matter of arriving at the end result. So there really wasn't much thought given, I don't think, by either of us at that time that there would be an appeal.

Six days after the sentencing judge had told Polly he had 60 days to appeal and his lawyer would be "glad to handle" it, Polly wrote to attorney Prichard. His concern, however, related to a failure to credit him with his time spent at Oakdale and in the Monona County jail pending disposition of his case. He asked Prichard to check at the clerk's office to see how much time he had served and to help straighten it out. Other communications expressed dissatisfaction with the reformatory. He wanted assistance in a transfer to the penitentiary at Lincoln, Nebraska, where he would be nearer his parents.

Polly never appealed. Over five years later, on September 18, 1980, Polly filed an application for postconviction relief in his Monona County criminal case, where it was assigned the same number. The application was based on the sentencing court's failure to hold a "degree-of-guilt" hearing, to consider the included offense of manslaughter, to inform Polly of the basic elements of first or second-degree murder, to establish a factual basis for the guilty plea, and to apply the *Sisco* standards. The application did not allege Polly was deprived of effective assistance of counsel.

Following a hearing on May 13, 1981, the district court, Judge D.M. Pendleton presiding, noted Polly was present in person and by his present counsel, Robert L. Sikma. The court found the matters complained of could have been presented on direct appeal, and no reasons had been presented for the failure to appeal. The court concluded Polly and his prior attorney knew of the right to appeal, the attorney knew of the remedies he might obtain by appeal, and that both evidently were satisfied as to the sentencing procedure. District court dismissed the application.

Polly appealed this decision and we transferred the case to the Iowa Court of

Appeals. That court reversed on the ground an interlocutory ruling by a different district court judge indicated the burden of proof was on the State to show Polly had grounds for taking a direct appeal but had not done so, while Judge Pendleton on final hearing seemed to impose a burden of proof on Polly. The court of appeals remanded with a direction that district court determine which party had the burden of proof, and if it should lie upon Polly, then to provide him with adequate notice and an opportunity to go forward with his evidence.

After the case was remanded, the district court in a prehearing proceeding ruled it was the State's burden to show Polly "deliberately and inexcusably failed to pursue his grounds now asserted for relief" on direct appeal, citing *Redding v. State*, 274 N.W.2d 315, 317 (Iowa 1979).

The second hearing on Polly's application for postconviction relief occurred May 13, 1983, Judge James P. Kelley presiding. Recent depositions of Polly and attorney Prichard were received in evidence. Polly's additional testimony was taken. He denied virtually all recollection of his plea and sentencing hearings, but remembered where the court reporter was sitting. He first claimed not to recall any discussion about appeal with either the court or his attorney; then asserted that if they had told him of his appeal rights, he would have appealed. When asked "[w]hen did you become dissatisfied with the fact that you were incarcerated for supposedly thirty years?" he responded, "I suppose about a year after I was there." When asked what he was dissatisfied with, he replied, "The time, I suppose." It was at that point, according to his testimony, when other prisoners explained to him what an appeal was. Polly claimed he then contacted a Sioux City attorney but could not pay his fee. Following that he wrote to "Iowa City University," but did not take any further

action until about four years later when this proceeding was filed.

June 17, 1983, the district court, relying on *Redding*, ruled Polly had shown there was no waiver of the right to appeal in the criminal case. The court set aside the judgment of conviction rendered almost eight years before, granted Polly the right to withdraw his guilty plea, and ordered a new trial.

The State now appeals, urging us to hold Polly has waived his right to raise these procedural deficiencies at this late date. It contends we should overrule *Redding*, or at least hold that decision inapplicable under the circumstances disclosed in this record.

### I. *Burden of Proof and Scope of Review.*

Despite the various burden-of-proof rulings in the checkered career of this case, we interpret the decision now appealed from as properly imposing the burden on Polly. *See* Iowa Code § 663A.8;[2] *Washington v. Scurr*, 304 N.W.2d 231, 235 (Iowa 1981); *Hinkle v. State*, 290 N.W.2d 28, 31 (Iowa 1980); *Bledsoe v. State*, 257 N.W.2d 32, 33–34 (Iowa 1977); *Rinehart v. State*, 234 N.W.2d 649, 657 (Iowa 1975).

Chapter 663A proceedings are law actions, triable to the court, and ordinarily are reviewed on error. However, when there is an alleged denial of constitutional rights we make our own evaluation of the totality of circumstances in a de novo type review. *Hahn v. State*, 306 N.W.2d 764, 768 (Iowa 1981); *Hinkle*, 290 N.W.2d at 31.

### II. *The Constitutional Error Issue.*

We turn first to the constitutional errors that Polly, in his postconviction application, alleges infected his plea and sentencing hearings.

Our analysis starts with the general rule that:

2. Section 663A.8 provides in relevant part: Any ground ... not raised ... in the proceeding that resulted in the conviction or sentence ... may not be the basis for a subsequent

application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted. ...

A postconviction proceeding is not an avenue for litigating issues that were not properly preserved for our review on direct appeal. Granted, failure to preserve error may be so egregious that it denies a defendant the constitutional right to effective assistance of counsel. [This postconviction applicant] does not present such a claim. We will not ordinarily allow a defendant to claim in postconviction proceedings that the trial court erred on issues that were not properly presented for our review on direct appeal.

*Washington v. Scurr,* 304 N.W.2d at 235 (citations omitted). *See Wenman v. State,* 327 N.W.2d 216, 217 (Iowa 1982) ("The fact that Wenman's claim was not previously adjudicated in a direct appeal does not necessarily mean he is entitled to urge it in a postconviction action."); Iowa Code § 663A.2 ("This remedy is not a substitute for ... direct review of the sentence or conviction."). A similar general principle guides federal decisions. *See, e.g., United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816, 828 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."); *Norris v. United States,* 687 F.2d 899, 903 (7th Cir.1982).

Polly asserts, however, that his case falls outside the above principles and within the exception announced in *Redding,* 274 N.W.2d at 317:

Failure to appeal bars relief in a postconviction action on the ground of abuse of process only as to factual and legal contentions which the postconviction applicant knew of at the time of the original trial court proceeding and which he deliberately and inexcusably failed to pursue on appeal.

Although not cited in *Redding,* it seems clear our ruling was consistent with *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837, 869 (1963),[3] where the following language is found:

If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits. ...

The United States Supreme Court, however, later was to label the *Fay v. Noia* language as dicta, and limited by the rule in *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). *Wainwright v. Sykes,* 433 U.S. 72, 85, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594, 607 (1977). The *Francis* Court, 425 U.S. at 542, 96 S.Ct. at 1711, 48 L.Ed.2d at 154–55, required that in a federal collateral attack upon a state court conviction the applicant must not only show "cause" for the failure to challenge the alleged error in state court, but must also show actual prejudice resulting from the errors of which he or she complains.[4] It is not sufficient that the applicant demonstrate the errors created a *possibility* of prejudice, he or she must shoulder the burden of showing they worked to his or her *actual* and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Frady,* 456 U.S. at 171, 102 S.Ct. at 1596, 71 L.Ed.2d at 832.

Some of the reasons undergirding the *Sykes* decision (narrowing the prior liberal grant of postconviction relief) were articulated recently in *Engle v. Isaac,* 456 U.S. 107, 126–29, 102 S.Ct. 1558, 1571–72, 71 L.Ed.2d 783, 799–801 (1982). These included extension of the trial ordeal for both society and the accused, degradation of the prominence and importance of the original

---

**3.** *See State v. Boge,* 252 N.W.2d 411, 415 (Iowa 1977) (McCormick, J., concurring specially).

**4.** In a habeas proceeding involving a state conviction, the *Francis* Court adopted a rule first applied with respect to a federal conviction in

*Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). *Francis v. Henderson,* 425 U.S. 536, 542, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149, 154–55 (1976).

criminal trial, diminution of the mutual concern of trial counsel and courts for the sanctity of constitutional safeguards when the right to correct such errors on postconviction is readily available, lessening of prisoner focus on good behavior and possible rehabilitation as prisoners concentrate on postconviction rather than parole for their release, and societal inability to punish the guilty when postconviction relief is granted so long after commission of the crime that retrial is a practical impossibility. Another reason, suggested by *Sykes,* 433 U.S. at 89, 97 S.Ct. at 2508, 53 L.Ed.2d at 609, is that defense counsel deliberately would elect not to appeal, thus providing the opportunity to importune a second (postconviction) district court on their client's behalf before submitting claims to an appellate tribunal. *See, e.g., Reed v. Ross,* —— U.S. ——, ——, 104 S.Ct. 2901, 2909, 82 L.Ed.2d 1, 13 (1984).

■ The above reasons, viewed in light of the flood of postconviction proceedings and the concomitant requirement to conserve judicial resources,[5] move us to reexamine our *Redding* rule. We now modify that rule by imposing the *Sykes* requirements that the applicant not only show "cause" (or Iowa Code section 663A.8 "sufficient reason") for failure to challenge the alleged errors in trial court, but also show actual prejudice resulting from these errors. Thus we turn to a de novo examination of the record to determine whether Polly met that burden.

### A. *Cause.*

■ The State concedes the plea and sentencing hearings did not comply fully with all of the *Sisco* requirements. We disapprove the court's failure to follow in detail those requirements. A few more minutes spent at that time would have avoided the long and expensive history of litigation in this case. *See* Iowa R.Crim.P. 8(2)(b) through (d).

■ Nonetheless, we find Polly has not demonstrated sufficient reason or "cause" for failing to raise on direct appeal the errors of which he now complains. The evidence is overwhelming that he and his attorney knew they had achieved a windfall bargain on a plea negotiation with a judge and under no circumstances would they have risked an appeal that would have relegated Polly to "square one" before another court.

The sentencing court's examination of Polly, with respect to his admissions of guilt to police officers on three different occasions, adequately shows the court had read the minutes of testimony accompanying the indictment. Clearly those minutes provided a factual basis for a guilty plea to first-degree murder. *See State v. Marsan,* 221 N.W.2d 278, 280 (Iowa 1974). The State apparently had evidence to support a theory the murder was premeditated, Polly intended to shoot his wife in the bathtub, dismember the body, and dispose of it in burlap sacks and boxes brought to the door, only to lose his nerve before the grisly task was completed.

At minimum, the State had Polly's admissions he and the victim were quarreling. Other evidence disclosed by the minutes would show he used two weapons, inflicting separate, multiple and deadly wounds, while his victim was helpless in the bathtub. Any competent defense counsel would have been concerned that this evidence established the specific intent element of first-degree murder, and most assuredly would warrant a finding of malice aforethought to support a jury finding of second-degree murder. *See State v. Smith,* 242 N.W.2d 320, 326 (Iowa 1976).

Further, Polly faced a mandatory life sentence if convicted of first-degree murder, Iowa Code section 690.2 (1975), or a sentence from ten years to life if found guilty of second-degree murder. Iowa Code § 690.3 (1975). Small wonder that, when Prichard finally found a judge who

---

5. *See United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805, 811 n. 11 (1979).

would agree to impose a 30-year sentence despite the above available State's evidence and the opposition of the county attorney, Polly grasped the opportunity to plead guilty to second-degree murder.

Our de novo review of the whole record leads us to reject Polly's postconviction testimony that he had little or no recollection of the plea or sentencing proceedings. Polly's volunteered statement, under examination by the county attorney, pointing out such minutia as where the court reporter was sitting at the plea hearing is at war with his avowed inability to recollect the event. Nor do we believe his testimony that he did not know what a sentence was, or where the "penitentiary" was located or what it was like. He had spent time at the reformatory before he was admitted to the Oakdale institution for examination. The second-postconviction hearing record shows Polly was sophisticated enough to have "read the record" and to request the county attorney "to refresh [his] mind" concerning letters to his attorney. Polly was competent enough to hold down employment in a grocery store and beef packing plant. The psychiatric examination disclosed no mental illness or brain damage and found he was "well aware of the nature and quality of the charges placed against him and the consequences if found guilty." We discern at work in this record what the examination found to be Polly's "strong tendency to avoid dealing with unpleasant experiences."

Defense counsel testified Polly "knew what was going on" at the plea hearing, and that he had explained the plea agreement and "advised [Polly] of his probabilities of trying the case and explored with him what I thought was a possible defense, but it was his election to plead and accept the plea bargain that was offered us." Our finding that Polly's plea was "voluntary" in a constitutional sense is aided by the presumption that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he or she is being asked to admit. *Marshall v. Lonberger,* 459 U.S. 422, 436, 103 S.Ct. 843, 852, 74 L.Ed.2d 646, 660 (1983); *State v. Higginbotham,* 351 N.W.2d 513, 514 (Iowa 1984); *see State v. Hansen,* 221 N.W.2d 274, 276 (Iowa 1974). It is significant that Polly's application never alleged he was deprived of the effective assistance of counsel, nor did Polly ever make that contention. Attorney Prichard had been practicing approximately 25 years at the time of these events and had criminal case experience both as defense counsel and as prosecutor.

Nor is there any doubt that Polly was advised fully of his right to appeal. However, he was well satisfied with his bargain until he had spent a year at the penitentiary, when he became dissatisfied with "the time."

In these circumstances we hold Polly has not shown "cause" for failing to raise in direct appeal the issues relating to procedural irregularities in his plea and sentencing hearings. Ordinarily the section 663A "sufficient reason" or the *Sykes* "cause" standard for failing to raise issues upon direct appeal logically may be based on the assumption that the issue, if known, would in fact be made a ground for a direct appeal then timely taken. That assumption, however, loses validity when a guilty plea proceeding has been based on extensive negotiations resulting not only in a degree-of-guilt agreement, but an agreement on the years of imprisonment to be included in the sentence.

■ Thus in a case like this it is not sufficient, in our view, to show that Polly did not know all the *Sisco* requirements and therefore did not know he had grounds for appeal. His burden should extend to include some minimal and believable evidence that, given such knowledge, he in fact would have exercised his appeal right. We have here only Polly's conclusion, eight years after the event, that, had he been informed of his appeal rights, he would have appealed. The court's full explanation to Polly of those rights is spread of record. We give this self-serving testimony no credence. We hold Polly's "cause" showing is inadequate to justify setting

aside his conviction, nine years after the event.

B. *Prejudice.*

█ Nor do we believe Polly has demonstrated he was prejudiced by the hearing infirmities he now points out. Much of what we have written in the last subdivision applies here. Polly and his counsel were confronted with overwhelming evidence that Polly had killed his wife in a gruesome and savage attack, after a quarrel, in circumstances that would trigger a finding of malice aforethought and would justify a finding of premeditation. Polly has never asserted he was convicted wrongly of a crime of which he was innocent. *See Frady,* 456 U.S. at 171, 102 S.Ct. at 1596, 71 L.Ed.2d at 832.

The "judge-shopping"—which we do not condone—and the subsequent negotiations culminated in an agreement that was to Polly's definite advantage. Disregarding our impatience and frustration with trial court's failure to follow strictly all of the plea and sentencing requirements—omissions which permitted this extensive litigation—we find on the whole record Polly was accorded substantial due process.

Polly has shown no prejudice resulting from district court's omissions, or that the defects worked to his actual and substantial disadvantage. *Frady,* 456 U.S. at 170, 102 S.Ct. at 1596, 71 L.Ed.2d at 832. It is clear he and his attorney had achieved a satisfactory plea agreement and regardless of any additional statements by the court, the same plea would have been entered and the same sentence imposed. As we indicated in the last subdivision, an appeal that might have sent the case back to district court—possibly before a different judge—would have been the last thing Polly or his attorney wanted at that juncture.

III. *The Alleged Statutory Violation Error.*

█ As we already have indicated, when Polly pled in district court Iowa Code section 690.4 (since repealed) provided that "if the defendant is convicted upon a plea of guilty [of murder] the court must by examination of witnesses, determine the degree." *See State v. Beverlin,* 263 N.W.2d 535, 537 (Iowa 1978). Here the court did not examine witnesses. The plea agreement already had determined Polly would plead guilty to, and be found to have committed, second-degree murder. It is apparent from the record that the court, with concurrence of the defense, used as evidence of the degree Dr. Loeffelholz's lengthy and detailed psychiatric evaluation report. Polly and his counsel obviously needed the opinion in the record that Polly's conduct had not been premeditated.

In these circumstances, we hold trial court's failure to hear the testimony of witnesses was not error that would justify setting aside the conviction in a postconviction proceeding years after the event. The *Sykes* cause-prejudice standard that we apply today with respect to the constitutional omissions surely would apply to a questionable statutory violation.

We find no grounds to set aside Polly's conviction. The district court decision appealed from is reversed.

REVERSED.

All Justices concur except McCORMICK, J., who dissents and WOLLE, J., who takes no part.

McCORMICK, Justice (dissenting).

Douglas Robert Polly is serving a 30-year sentence for second degree murder despite the fact he was not validly convicted. He has never had a trial, and his guilty plea was defective. He is denied relief solely because he challenges his conviction by postconviction action rather than direct appeal. This is so even though he was unaware of the grounds for appeal until after the period for appeal had expired. Because I believe this is the kind of case in which the General Assembly intended postconviction relief to be granted, I am unable to agree with the court's opinion.

I. *The issue of statutory interpretation.* Chapter 663A is Iowa's version of the Uniform Post-Conviction Procedure

Act. *See* Unif. Post-Conviction Procedure Act, 11 U.L.A. 485 (1974). In the present case, the relevant statutory provision is section 663A.2 which authorizes postconviction relief when "[t]he conviction or sentence was in violation of the Constitution of the United States or the Constitution or laws of this state". § 663A.2(1). The section also provides: "This remedy is not a substitute for nor does it affect any remedy, incident to the proceedings in the trial court, or of direct review of the sentence or conviction." § 663A.2.

In *Redding v. State,* 274 N.W.2d 315, 317 (Iowa 1979), this court interpreted the limitation in section 663A.2. The postconviction applicant in that case challenged his conviction on the ground his guilty plea was involuntary and invalid because not taken in compliance with *State v. Sisco,* 169 N.W.2d 542 (Iowa 1969). The applicant had not appealed. The State asserted there as it does in this case that postconviction relief was barred because the applicant did not have an adequate excuse for failing to make his claims in a direct appeal.

In rejecting the State's contention, this court found that the involuntariness claim depended on evidence extrinsic to the plea proceeding that would not have been in the record on direct review. The court separately found that the *Sisco* claim was not barred because the record did not show the applicant was aware of that claim in time to appeal.

The *Redding* court contrasted the availability of postconviction relief when the applicant has previously attacked the conviction by appeal or prior postconviction action. In that situation, governed by section 663A.8, the applicant "must establish a sufficient reason why each new ground for relief was not previously asserted." *Redding,* 274 N.W.2d at 317. Section 663A.8 has no application, however, when review has not previously been sought. Therefore, to the extent the court today relies on section 663A.8 or cases applying that provision, no statutory basis exists for doing so.

In interpreting section 663A.2 in *Redding,* this court found the limitation is a proscription of abuse of process. As a result the court said:

> A failure to take an appeal does not alone constitute a waiver of the right to attack the conviction by postconviction action. Failure to appeal bars relief in a postconviction action on the ground of abuse of process only as to factual and legal contentions which the postconviction applicant knew of at the time of the original trial court proceeding and which he deliberately and inexcusably failed to pursue on appeal.

*Redding,* 274 N.W.2d at 317. Cited in support of this interpretation of section 663A.2 was *Horn v. Haugh,* 209 N.W.2d 119 (Iowa 1973). In *Horn* this court applied an interpretation of section 663A.2 expressed in ABA Standards, *Post-Conviction Remedies* § 6.1(c) (Approved Draft, 1968). *Horn,* 209 N.W.2d at 120–21. That interpretation is the "rule" adopted in *Redding.*

The ABA standard provides in relevant part:

> Where an applicant raised in a postconviction proceeding a factual or legal contention which he knew of and which he deliberately and inexcusably ... failed to raise in the proceeding leading to the judgment of conviction, or ... having raised the contention in the trial court, failed to pursue the matter on appeal, a court should deny relief on ground of abuse of process. If an application otherwise indicates a claim worthy of further consideration, the application should not be dismissed for abuse of process unless the state has raised the issue in its answer and the applicant has had an opportunity, with the assistance of counsel, to reply.

ABA Standards, *Post-Conviction Remedies* § 6.1(c) at 85 (Approved Draft, 1968). In its commentary the ABA committee discusses the concept of waiver as employed in the standard:

> The term is subject to multiple meanings or shades of meanings which can result in confusion in communication and, perhaps, in thought. One usage employs waiver as expressive of a rule of finality

of judgments: issues that were not presented at a specified time or in a specified way are said to have been waived.... A wholly different waiver is implied in the familiar principle that a party to a criminal action can intelligently and understandingly forego certain rights, and that his choice will be binding upon him. This suggests an active, knowing choice, in advance of the occasion when the waived right might have been useful, affirmatively expressed in the appropriate forum....

... The distinction between these is clearly visible when a federal constitutional right is considered in the context of a state post-conviction proceeding: what constitutes a waiver-voluntary-relinquishment is a question of federal constitutional law; the question of the scope of a prior judgment is a question of state procedural law.... Where it is found that an applicant has relinquished a right, the decision is tantamount to holding that the right was never violated. The decision, thus, is directly on the merits....

As used in this report, "waiver" refers to voluntary relinquishment rather than foreclosure by judgment.

*Id.* at 88–89.

It is no coincidence that this court adopted the ABA standard in interpreting section 663A.2. The 1966 revision of the Uniform Act, adopted in Iowa in 1970, was prepared contemporaneously with the development of the ABA standards. The 1966 act was intended to mirror the standards on postconviction remedies. *See* Uniform Post-Conviction Procedure Act (1980), Commissioner's Prefatory Note, 11 U.L.A. (Supp.1982) at 137.

Thus in *Horn* and *Redding* this court interpreted section 663A.2 in accordance with the intent of the drafters as reflected in the legislative history. The statute is the same now as it was then. Nothing in the language of the statute or its history provides any basis for abandoning the prior interpretation.

Of course, under the statute as interpreted in *Horn* and *Redding,* Polly's invalid conviction could not stand. Applying the *Redding* interpretation, the postconviction court found on substantial evidence, indeed upon an uncontroverted record, that Polly was unaware of the factual and legal grounds urged in the present action until well after the period for appeal. On this statutory issue the postconviction court's finding thus has the force of a jury verdict. *Stanford v. Iowa State Reformatory,* 279 N.W.2d 28, 31 (Iowa 1979).

II. *The invalidity of the conviction.* No one questions the invalidity of Polly's plea. The plea was taken in a strange proceeding in which the trial court acted as an arm of the prosecution and expressed the view that the plea bargain obviated the necessity of compliance with the procedural requirements of *Sisco.*

The court was confronted with an emotionally disturbed young man with an IQ of 79 who had no previous encounter with the law. It is true Polly "never denied" having killed his wife, but he also consistently denied any memory of the relevant events. The record shows that after the killing he did not merely call an undertaker to report the death. He drove to the police station and collided with two motor vehicles on the way. He was incoherent when he arrived at the station. He was too emotionally distraught to be held in the local jail, and he was treated as well as evaluated upon his commitment to Oakdale.

Despite this background the court wholly failed to determine by personal colloquy with Polly that Polly understood the charge and its penal consequences. Nor does the record show the judge established a factual basis for the plea on the record. *See Brainard v. State,* 222 N.W.2d 711, 713 (Iowa 1974). In addition the record shows that all participants in the proceeding were unaware that the included offense of manslaughter would be considered in a degree-of-guilt hearing. *See State v. Beverlin,* 263 N.W.2d 535, 538 (Iowa 1978); *State v. Martin,* 243 Iowa 1323, 1329, 55 N.W.2d 258, 262 (1952). The trial court informed

the defendant that unless the hearing were waived "the court must have a hearing of some kind to determine whether it's first or second degree." No one corrected this misadvice.

The judge resisted efforts by the prosecutor to have him comply with the *Sisco* standards in taking the plea. In doing so the judge said: "When he agrees to plea bargaining, if he is satisfied with the work of his attorney and is satisfied with the sentence, we don't have to go through the *Sisco* warning." Even though this court disapproves of the mishandling of the plea taking, the outcome today confirms the accuracy of this statement by the judge.

The United States Supreme Court has held that a valid waiver of federal constitutional rights on the record in a guilty plea proceeding is a federal constitutional requirement: "We cannot presume a waiver of these three important federal rights from a silent record." *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279–80 (1969). A plea of guilty is a "grave and solemn act" which as a matter of federal constitutional law must not only be voluntary but knowing, intelligent and done "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed.2d 747, 756 (1970). Moreover, "[I]t is too late in the day to permit a guilty plea to be entered against a defendant solely on the consent of the defendant's agent—his lawyer.... [T]he choice to plead guilty must be the defendant's: it is *he* who must be informed of the consequences of his plea and what it is that he waives when he pleads, ... and it is on his admission that he is in fact guilty that his conviction will rest." *Henderson v. Morgan*, 426 U.S. 637, 650, 96 S.Ct. 2253, 2260, 49 L.Ed.2d 108, 117–18 (1976) (White, J., concurring). Polly's plea cannot withstand analysis under these principles.

On the merits, I would hold that Polly's conviction should be vacated and that he should be permitted to plead anew.

III. *The "cause and prejudice" standard.* The court today superimposes on chapter 663A a court-made limitation of an applicant's statutory right to postconviction relief. This is an exercise of raw judicial power that is neither warranted nor wise.

The judicial limitation is taken from *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *Sykes* involves an interpretation of the federal habeas corpus statute, 28 U.S.C. section 2254, concerning the circumstances in which a state procedural default will bar federal habeas relief. The case has no bearing on the meaning that should be given our postconviction statute. The present issue is one of interpreting section 663A.2; this is not an occasion for judicial rulemaking. Nor is any reason suggested for believing this court's previous interpretation of section 663A.2 is incorrect.

In addition, as observed by Chief Justice Burger in his concurring opinion in *Sykes*, the standard for habeas review adopted in that case should not apply to decisions that cannot be delegated to counsel, such as the decision whether to appeal. *See* 433 U.S. at 93, 97 S.Ct. at 2509, 53 L.Ed.2d at 612 (Burger, C.J., concurring). Thus, even if the *Sykes* holding were otherwise relevant, it should be inapplicable to the kind of decision in the present case.

This result follows from the nature of the right to appeal. Just as the decision to plead guilty or to waive the constitutional rights relinquished by a guilty plea cannot be lost through a default by counsel, the right to appeal should not be forfeited through any act short of a knowing and intelligent waiver by the defendant. The lawyer is not the defendant's agent for purposes of that decision. The decision is entrusted to the defendant alone. It is artificial and false to forfeit the defendant's right to appeal when the defendant was concededly unaware of the grounds for the right's exercise and was denied the opportunity to make an informed choice.

It is no answer to say that Polly has failed to prove he would have appealed if he were aware of the deficiencies in the

proceeding. This response in effect puts the burden on a postconviction applicant to prove a defective conviction did not result from harmless error. One might as well refuse to vacate a guilty plea proceeding in any case where this court is not persuaded the result would be different if the proceeding had been valid. A standard of this kind reverses the presumption of innocence. Hereafter the State may deem any person accused of crime to be guilty. The accused then will have the burden not only to show the invalidity of the conviction but that the conviction would not have occurred if the proceedings had been valid. Here a person who has admittedly never been validly convicted has lost his right to challenge his conviction because this court imputes a decision to him that he never had an opportunity to make.

None of the evidence against Polly discussed by this court was ever introduced in an adversary proceeding. It is all taken from the State's summary of grand jury testimony. Because the court relies on this evidence in barring Polly from postconviction relief, the result is a conviction that will stand, not because of a guilty verdict or a valid guilty plea, but because of this court's impression of the probative force of the prosecutor's unsworn summary of the testimony that preceded the indictment. All of this occurs despite the fact the evidence heard by the grand jury and the indictment itself could have no probative force in the adjudication of the accused's guilt. *See State v. Hall,* 235 N.W.2d 702, 712 (Iowa 1975), *cert. denied,* 434 U.S. 822, 98 S.Ct. 66, 54 L.Ed.2d 79 (1977).

The State in its brief disparages the right of prisoners "who have nothing but time [to] encumber the judicial process, disrupt attempts at rehabilitation, and flout any notion of finality of judgment." The State requested and now has obtained a judicial barrier to postconviction relief even for prisoners who have been invalidly convicted and who were unaware of the defects in their convictions in time to appeal. Before now prisoners were entitled to one review of their convictions, either on appeal or, under the *Redding* interpretation of section

663A.2, through postconviction action. Today's decision establishes a category of invalid convictions that will never be reviewed in Iowa courts even when the right of appeal has not been deliberately bypassed.

The wrong in this case was not the prisoner's delay in seeking vindication of his rights until he became aware his rights had been violated. The wrong was the failure of a judge to follow procedures dictated by the United States Constitution and this court in receiving a guilty plea. It is difficult to believe that the Constitution is served or justice is done by penalizing the prisoner for the judge's mistake.